[No. 20737. Department Two. December 15, 1927.]

BEULAH V. DIXON, *as Administratrix, Respondent,* v. W. A. HAYNES *et al., Appellants.*[1]

[1] PARTNERSHIP (44)—TORT OF PARTNER—LIABILITY OF FIRM. A copartnership is liable for the tort of a member of the firm in driving a firm truck while so intoxicated that he was incapable of intelligent action, if he was on the business of the firm, although the other partner had no knowledge of his drunken condition; nor could his conduct be considered deliberate and intentional action where he pleaded guilty of involuntary homicide.

[2] MASTER AND SERVANT (172)—INJURIES TO THIRD PERSON—ACTS WITHIN SCOPE OF EMPLOYMENT. Where a drunken servant was driving a truck load of coal either for delivery to a customer or to the master's home, it is conclusively established that he was engaged in the business of the master.

[3] PARTNERSHIP (44)—TORT OF PARTNER—BUSINESS OF FIRM. A slight deviation from the route that an intoxicated co-partner should have taken, in driving a truck load of coal, is not sufficient to overcome the presumption that he was on the business of the firm, when he struck and killed another.

[4] MASTER AND SERVANT (172)—INJURIES TO THIRD PERSONS—SCOPE OF EMPLOYMENT—VIOLATING LAW. Where a drunken servant is driving a truck load of coal in the business of the master, the

[1]Reported in 262 Pac. 119.

master is liable for a wrongful death which is the proximate result of his driving an automobile while intoxicated in violation of Rem. Comp. Stat., § 2527, though the master had no knowledge of his intoxication.

[5] TRIAL (52)—CONDUCT OF COUNSEL—CORRECTION OF OBJECTIONABLE MATTER. Error cannot be assigned upon the attempt of counsel to read to the jury a paper not in evidence, where upon objection he was stopped by the court and directed to make no reference to it.

[6] EVIDENCE (134)—DOCUMENTARY EVIDENCE—MORTALITY TABLES. It is not error to receive evidence and instruct the jury as to the expectancy of life of a beneficiary, without first taking proof of her health and physical condition or showing that she is an insurable risk.

Appeal from a judgment of the superior court for King county, Moriarty, J., entered April 18, 1927, upon the verdict of a jury rendered in favor of the plaintiff, in an action in tort. Affirmed.

*Reynolds, Ballinger & Hutson,* for appellant.

*Tucker, Hyland & Elvidge* and *Butler & Weiss,* for respondent.

HOLCOMB, J.—Respondent sued as the administratrix of the deceased, an unmarried man, for the benefit of the father and mother of the deceased, who were alleged to be dependent upon deceased for support during his lifetime, and recovered a judgment for the full amount sued for in the sum of $8,504.50, which, upon a motion for a new trial, was conditionally reduced to $5,504.50, which was accepted and judgment entered.

Deceased was engaged in operating a one-ton truck as grocery delivery man, at the time of his death, was thirty-one years of age, was earning thirty dollars per week, was residing with his father and mother, who were dependent upon him, and contributed regularly to their support from eighty dollars to eighty-five dollars per month.

Deceased was crushed to death by the impact between a two-ton truck, driven at the time by Charles E. Haynes, one of the appellants, and the one-ton delivery truck, standing on the street at the time, and from which deceased was removing a box of groceries for a customer. The two-ton truck, which struck the rear of the delivery truck at the rear of which deceased was standing at the time, was loaded with about two tons of coal, which had been purchased by appellants from the Pacific Coast Coal Company, at their bunkers at the foot of Dearborn street, in Seattle. Charles E. Haynes was, at the time, intoxicated. The collision occurred opposite the baseball park on Rainier avenue in Seattle, at about 5:30 or 6:00 o'clock in the afternoon of August 27, 1926, while it was still daylight and while the streets were perfectly dry. Deceased had brought his delivery truck, which he had been driving southerly on Rainier avenue, to a stop about two hundred and fourteen feet north of the intersection of Rainier avenue and McClelland street, near the west margin of Rainier avenue. He immediately alighted and went to the rear of the truck for the purpose of removing the box of groceries. While his delivery truck was standing still and clearly visible for several hundred feet, appellant Charles E. Haynes, also traveling in a southerly direction, at an excessive rate of speed and in a very erratic course, approached from the north, behind deceased and, without notice or warning, ran into him.

The Empire Transfer Company was a co-partnership (being an assumed name for the partnership which, at the time, existed between W. A. Haynes and Charles E. Haynes, each owning a one-half interest in it), engaged in handling freight with heavy-duty trucks. Charles E. Haynes was employed by the firm at a salary of five dollars per day. Whether any salary was paid to the other partner is not shown. The

partners lived with their mother at 1726 Twenty-fourth Avenue South, in Seattle, and maintained the household. On the day and at the time of the accident, Charles E. Haynes was on his way home, according to the testimony of appellants, with a load of coal in the truck, which was the property of the firm.

That Charles E. Haynes was very greatly intoxicated is thoroughly established. There is evidence on the part of appellants that the other partner did not furnish the liquor, authorize Charles E. Haynes to drink it, or know that he was intoxicated or what he was doing at the time of the accident.

The evidence in the record that Charles E. Haynes was on his way home with a load of coal which was the property of the firm and that he deviated from his regular and proper route from the bunker of the coal company to the home of appellants, by going beyond the street at which he should have turned from Rainier avenue toward his home, is wholly the testimony of appellants and interested witnesses, and the theory of respondent is that the jury was not required to believe that evidence, but that it could be inferred from the business of appellants that Charles E. Haynes was on his way to deliver the coal to some customer, without deviation.

The map and evidence show that there are no intersecting streets across Rainier avenue for several blocks after passing Plum street, which appellants contend would have been the proper street for Charles E. Haynes to have left Rainier avenue to go to the home of appellants, and that the accident occurred about two hundred and fourteen feet short of five blocks southerly from Plum street.

The several errors alleged by appellants are grouped and argued under about six groups. The argument ranges very widely.

[1]  The first assignment is argued under the following heading:

"Is a co-partner liable for a tort committed by another member of the firm who, without his knowledge or consent, consumes intoxicating liquor to such an extent as to become incapable of intelligent action, and who then uses an instrumentality belonging to the co-partnership with which to commit a tort?"

It is asserted that Charles E. Haynes, the driver, while a partner and owning a one-half interest in the business, was intoxicated to such an extent that he was irresponsible for his acts, and that no liability would extend to the co-partnership, but should be limited to him as an individual.

It is also insisted that this was no accident, no negligent act, in the sense of the terms used in the cases; that a person does not negligently become intoxicated, but does so wilfully. It is also asserted that the act of Charles E. Haynes was deliberate, laying stress upon the use of the word "deliberate" by one of the witnesses, and that therefore it must be considered a wilful and deliberate act, at least, in becoming intoxicated.

From the above premises, appellants seek to deduce the inference that, even though Charles E. Haynes was on the business of the firm, the injury did not occur accidentally or negligently, but deliberately, and to bring themselves within the rule of the cases where one partner is not liable for the wilful, malicious and deliberate act of another partner in committing a tort.

We commence with the primary presumption under our law, arising from the ownership of the car in the firm and its use by one of the firm, as its agent or servant, during which use the casualty occurred. It may be assumed, as the truth, that the other partner of the firm had no knowledge of the drunken condition of its driver; but that is as immaterial as any other

act of carelessness or negligence, or even recklessness, on the part of one who became intoxicated, incompetent and reckless, to whom the instrumentality was entrusted. Neither can it be assumed that, because of the drunkenness of the driver and his driving, apparently deliberately, as one of the witnesses said, into the truck of deceased and into deceased, it is not an act of negligence. Charles E. Haynes pleaded guilty to a charge of manslaughter; and manslaughter, under our law, is involuntary homicide. He probably could not have been convicted of voluntary homicide, in the condition in which he was at the time of the killing. There was, therefore, no deliberate homicide. Nor was it wilful or malicious in the sense in which the law uses such terms.

Charles E. Haynes, being a partner, cannot be deemed a mere employee, or servant, of the firm. His acts and omissions, if done within the scope of the business of the firm, would be the acts or omissions of the firm, and of each partner.

"That as a general rule partners are all liable to make indemnity for the tort of one of their number, committed by him in the course of the partnership business, is familiar doctrine. It rests upon the theory that the contract of partnership constitutes all its members agents for each other, and that when a loss must fall upon one of two innocent persons he must bear it who has been the occasion of the loss or has enabled a third person to cause it. In other words, the tortious act of the agent is the act of his principals, if done in the course of his agency, though not directly authorized." *Stockwell v. United States,* 13 Wall. (U. S.) 531.

[2] But, if we apply the ordinary principles of master and servant, or of principal and agent, as argued extensively here, in considering the question of the liability of the firm for the tortious act of one of them, appellants have no better case.

"The earlier cases held that the master was not liable for the wilful or malicious acts of his servant, as distinguished from his neglect, unless the act was done pursuant to the master's express orders or with his assent, notwithstanding it was done in the line of the servant's duties. It is now well settled, however, that the master is liable for the wilful or malicious acts of his servant where they are done in the course of his employment and within its scope." 26 Cyc. 1527; 39 C. J. 1292.

The above texts cite many cases from about eighteen jurisdictions in support of the modern doctrine. In 39 C. J., *supra,* it is said:

"But now in almost all jurisdictions it is well settled that the master is liable for the wilful or malicious acts of the servant done in the course of his employment and within its scope, although the acts were not expressly ratified by the master or authorized by him. Such acts are imputable to the master under the doctrine of respondeat superior, and in accordance with general principles heretofore discussed the master will be liable, although the acts were in disobedience of express orders or instructions given by him, or although the particular act complained of may have been in excess of the servant's authority, and regardless of the motive or intention of the servant."

See, also, 6 Labatt's Master & Servant (2d ed.), p. 6693.

In 20 R. C. L. 914, § 126, among other things, it is said:

"The test of the liability is based on a determination of the question whether the wrong was committed in behalf of and within the reasonable scope of the business of the partnership. If it was so committed, the partners are liable as joint tortfeasors. Being liable as joint tortfeasors the party aggrieved has his election to sue the firm or to sue one or more of its members, and may even single out for suit a partner who personally was in no wise involved in the commission of the tort. . . . ."

Whether the coal that was being transported by the appellant driver, at the time of the accident, to some customer of the firm or to their own home, we consider immaterial. It was as much the business of the partnership to carry their own coal in their own truck to their own home for their own use and benefit, as any other carriage for hire of such commodity for others. It is, therefore, conclusively established in this case that the driver was engaged in the business of the firm when the accident occurred. Consequently, the firm would be liable for any negligence, or even recklessness, in the manner of the use of the instrumentality of the firm by the driver. The cases cited by appellants from this and other jurisdictions, where it was held that, at the time of the injury or damage, the servant inflicting the same was not acting within the scope of his authority or within the scope of the business of the employer, are not in point.

[3] The next contention of appellants is stated as follows:

"Is the criminal act committed by a co-partner, while in an intoxicated and drunken condition, and while deviating from the direct route of his destination, within the scope or purpose of the co-partnership business?"

*George v. Carstens Packing Co.*, 91 Wash. 637, 158 Pac. 529, and *Savage v. Donovan*, 118 Wash. 692, 204 Pac. 805, are cited as controlling upon that question. We think the portions of those cases relied upon by appellants answer them.

In the *George* case, it was said that there was ample room for honest difference of opinion upon the question of fact as to whether or not the employee in charge of the automobile was, at the time of the injury, acting within the scope of his employment so as to render appellant liable. Here, there is not.

In the *Savage* case it was said that, after starting upon the mission directed by the owner of the car, the driver made a marked and radical deviation to other parts of the city, where he remained for more than an hour, engaged in his own pleasure and pastime.

No such circumstance was shown in this case, and the deviation here, from the route that the driver should have taken from the coal bunker to the home of appellants, was not very great. It was not so great that appellant had so far deviated from the proper route of travel in delivering the coal to appellants' home, if that was the place where it was to be delivered (which was a question of fact for the jury), as to overcome the presumption and inference that he was still acting in the line of the performance of the business of appellants.

There is nothing contrary to the above statement in the case of *Feldtman v. Russak,* 141 Wash. 287, 251 Pac. 572, where the testimony of interested witnesses had been corroborated, and then not refuted by the plaintiff in the case, the court holding that the presumption in favor of the plaintiff had been entirely overcome.

[4] Appellants next argue that a master is not liable for the injury caused by an employee which is the proximate result of his driving an automobile while intoxicated. The solvent portion of the premise assumed is omitted, which is, while so driving on the firm's business. Rem. Comp. Stat., § 2527 [P. C. § 9090], making it a misdemeanor for any employee to drive any vehicle upon any public highway while intoxicated, is cited.

It is asserted that, in all the cases where injuries have resulted from the use of intoxicating liquors, in order to sustain a verdict against a third party, it has been necessary to allege and prove that the third per-

son had knowledge of the use of the intoxicating liquor. *Mitchell v. Churches,* 119 Wash. 547, 206 Pac. 6, is cited to the point. In that case, it is true that the owner of an automobile *knowingly* permitted an inveterate user of intoxicating liquor to drive a car in which he had an interest, and it was held that the owner was responsible.

In *Williams v. Missouri Pac. R. Co.,* 109 Mo. 475, 18 S. W. 1098, the railway company was held responsible for injuries caused by the negligence of an intoxicated engineer, the plaintiff being required to establish, and did establish, that the railway company had knowledge of such fact.

We cannot see the applicability of those cases, nor can we see the necessity of bringing home to one of the owners of an instrumentality, in the hands of another, which caused injury, knowledge of the intoxication of the user of the instrumentality at the time of the injury. If the driver was incompetent or reckless from any cause, the principle of *respondeat superior* would apply just the same. Moreover, here it was not a third party, but a principal.

Under our law and decisions, all that is necessary is to show the negligence of the person causing the injury, and the responsibility of the owner of the instrumentality. That, we think, is amply shown by the facts in this case and our decisions.

[5] Appellants also contend that their motion for a new trial should have been granted, on account of misconduct of counsel for respondent in his argument to the jury, and on account of an instruction given to the jury as follows:

"At the time of the injury, the mother of said deceased was of the age of 64 years and, in accordance with the mortality tables of this state, she had an expectancy of 11.67 years."

These complaints are argued together, and it is asserted that the misconduct of counsel and the erroneous instruction resulted in an excessive verdict in favor of respondent.

The misconduct of counsel, complained of, consists of an attempt by one of the counsel for respondent to read something to the jury which had not been introduced in evidence, appearing to be a eulogy of deceased, or something of the kind. Upon objection, the court refused to allow counsel to read it, and counsel for respondent was peremptorily directed to refrain from making any reference to any document not in evidence. Although counsel for respondent should not have attempted to read anything to the jury which had not been introduced in evidence on the trial, the court fully protected the rights of appellants, so that no prejudicial error occurred.

[6] Under the alleged erroneous instruction, appellants assert that mortality tables are admissible only where the record shows the person whose life expectancy is at issue is in average good health at the time, and they correctly assert that the evidence in this case shows that the mother of deceased had been in poor health for eight years, unable to do much work, and was not an insurable risk. It is insisted that, in order to have a life expectancy to which mortality tables may apply, such person must be an insurable risk.

Every person has some life expectancy, until life actually ceases. It is not necessary that the person be an insurable risk in order to have life expectancy. 19 R. C. L. 216, 217.

Under the above texts, while the probative effect of mortality tables may be impaired or destroyed, they are not rendered inadmissible by evidence of disease or ill health on the part of the person to whom they are applied, or that he was not an insurable risk.

Moreover, the court, in other instructions, advised the jury that they should take into consideration the age and condition of dependency of the parents and such other facts and circumstances as would tend to determine the actual pecuniary loss to such dependent parents.

We have no doubt that the trial court exercised a proper discretion in reducing the verdict, as it was reduced, and entering judgment for the amount of the recovery.

Although unable to review at length all the cases cited by appellants, we have considered them all, and find no justifiable cause for reversing the judgment.

Affirmed.

MACKINTOSH, C. J., FULLERTON, MAIN, and ASKREN, JJ., concur.