CHARLES J. SCHUCK, JUDGE,
dissenting.
The question involved in the issue presented for our consideration and determinaron and as shown by the majority opinion is, of course, whether or not Dewey Taylor, the state road employee in charge of the station wagon which collided with claimant’s truck and brought about the injuries in question, was at the time of the collision acting within the scope of his employment. That he was grossly negligent in causing the accident, and that none of the claimants were guilty of any contributory negligence is in fact admitted, and need not be considered by me in this dissenting opinion.
Dewey Taylor had been employed by the state road commission at different times for a period of about eighteen years. He was last employed by the commission in October, 1943, vand thereafter remained in its employ continuously until the time of the accident; from 1938 to 1942 and from 1943 to the date of the accident in July 1943, had acted as a crew chief or field *211 superintendent in charge of some six or seven men comprising a surveying crew. The men were under his supervision and direction, and he was responsible to the road commission for their activities. His immediate superior was L. C. Madden, chief engineer of the plans and survey department of the state road commission. Taylor moved his crew from place to place as directed, and as his particular work required, and likewise made arrangements for their accommodations and supervised their work in the field.
The testimony reveals that on each job convenient field headquarters would be established where board and room for the men could be obtained and that the arrangements for such accommodations were in the hands of and carried out by Taylor. The crew usually worked from eight o’clock A. M. to four o'clock P. M., except Saturdays, when they would quit at twelve o’clock noon. Taylor, in his supervisory capacity, had other duties in connection with his work, namely, the bookwork reflecting the work and progress that had been made on a job and which was summarized for the purpose of reporting the details to his superior at headquarters; this work required extra time on his part and was usually performed either at his home or at and near the place where the crew was employed. This bookwork, of course, was a necessary part of his employment, and on the day of the accident, according to the testimony, he had been engaged for several hours at Ripley, West Virginia, the place of the crew headquarters, in finishing and completing the facts and figures concerning the survey that was being made some fifteen miles from Ripley. Ever since he began to act as crew chief, back in 1 938, the road commission had furnished him a motor vehicle or station wagon to use in and .about the performance of his duties. He was entrusted with the complete custody, control, and management of such vehicle, and of course would be responsible for it during all of the period that it was in his charge and care. I make the positive observation that the record reveals that Taylor was never at any time given any specific instructions or directions, either oral or written, by his superior or anyone else in the road commission as to what use *212 he could or could not make of the vehicle. Of course, the evidence shows that the question was asked Madden, his immediate superior, as to whether he had given him any authority to use the station wagon; it was answered in the negative, but this testimony means absolutely nothing so far as the authority vested in Taylor in using the wagon in question was concerned. It was not denied that he had the right to use it at all times; that he did so use it, and that he had not only used it three or four times while working on the job near Ripley to return to his home as he was doing at the time of the accident, but that he had also used it while working on a job near Parkersburg in driving to his home over the week end. These facts, to my notion, establish beyond all question that full authority had been given to Taylor to use the station wagon at all times in the'course" of his employment, and especially so in going to his home over week ends; and further that his use of the wagon under the circumstances and facts as revealed lead to the conclusion that this was part of the consideration of his employment and seemingly expeditious in carrying out his work, and therefore in the end beneficial to the road department.
The accident happened, as indicated, through the gross negli-14, 3 945, the date of the accident, Taylor and several of his crew left Ripley at about two o’clock P. M. on the way to the home of the said Taylor and one John Walker, a member of the crew, both of whom lived at Walton. Taylor intended to stop at Spencer, and did stop there, where he negotiated arrangements with the manager of the hotel to accommodate his crew at that particular place and which was being moved from the operations near Ripley to new work in and about Spencer.
The accident happened, as indicated, through the gross negligence and carelessness of the said Taylor, between Spencer and the town of Walton about six-thirty or seven o'clock on the night in question, and was caused by Taylor deliberately crossing to the wrong side of the road and bringing about, while traveling at a rather high rate, of speed a violent collision with the claimants, who were traveling in the opposite direction and thereby causing serious injuries to (he claimants and perhaps *213 serious permanent injuries to at least one of them. Taylor, at the very scene of the accident, admitted his negligence and carelssness. Throughout the hearing and nowhere in the majority opinion, is any negligence of any kind imputed to the claimants or any of them.
In my opinion, considering all the circumstances, namely, that Taylor was acting in a supervisory capacity and at places and points away from the employer’s main headquarters, that he was vested with the right to exercise judgment and discretion in the performance of his own duties as well as those of his crew; that no specific instructions, either oral or written, had ever been given him defining and limiting the range or scope within which he could act, made him, in fact, a sub-principal and liable in a higher degree for injuries to innocent third persons than some minor employee of the crew would have been. Taylor himself was driving the station wagon at the time of the accident.
Courts have held as shown by the case of Ashland Coca-Cola Bottling Co. et al v. Ellison et al, 252 Ky. 172; 66 S. W. (2d) 52, that, where the employee’s timéis not confined and calls for the general supervision of the company’s business through traveling over the territory and with general authority to use the company’s automobile, circumstances tending to support the charge that he was about his master’s business assume an importance and call for consideration greater than would the same circumstances were the employee a minor one. So also, have courts held that the relationship of master and servant does not depend merely on the time employed at the employee’s actual work, but may exist outside of actual working time. Our own West Virginia Court' of Appeals has several times held that the real test or criterion of whether a servant's act is within the scope of his employment lies in the relationship which the act done bears to the employment. Cochran v. Michaels 110 W. Va. 127; and other cases.
That Taylor stopped at Spencer and made the arrangements for accommodations for his crew which was to be quartered *214 the following week is uncontradicted. However, the state road de partment insists that Taylor was drunk or intoxicated at the time of the accident and that under the circumstances as herein set forth, he was not acting within the scope of his employment It may be well to dispose of the question of intoxication before considering the other matter which I believe to be conclusive so far as the liability of the state road commission is concerned.
As is so ably set forth in claimant’s brief, I hold to the opinion that whether or not Taylor was intoxicated is immaterial upon the inquiry as to whether at the time of the accident he was acting within the scope of his employment. Blashfield's Cyclopedia of Automobile Law & Practice, Vol. 5, Sec. 3036, and cases cited, lays down this rule, which in my judgment controls so far as the question of intoxication involved in this issue may be concerned, to wit:
"According to some authority, and probably the . better rule, the taking of a drink by a servant in violation of his instructions is not such a deviation, of itself, from his duty as to sever pro tempore the relationship of master and servant and to relieve the master from liability for his negligence in operating the vehicle while intoxicated.
"Consequently, if the servant is acting otherwise within the scope of his employment, the master is liable for damages arising from acts of the servant, although, the servant at the time was intoxicated. This is true, although, the master did not know that the servant was intoxicated.’’ Blashfield’s Cyclopedia of Automobile Law & Practice, Vol. 5, Sec. 3036, and cases cited. Cleveland Nehi Bottling Co. v. Schenk (C.C.A. Ohio), 56 F. (2d) 941; Dixon v. Haynes, 146 Wash. 163, 262 P. 119; Crockett v. U. S. (C.C.A. W. Va.), 116 F. (2d) 646; Taylor v. Joyce, 4 Cal. App. (2d) 612, 41 P. 62d) 967; V. L. Nicholson Const. Co. v. Lane, 177 Tenn. 440, 150 S. W. (2d) 1069; Erdman v. Henry S. Horkheimer & Co. etc., 169 Md. 204, 181 A. 221.
The matter of whether Taylor was intoxicated or not is of itself not germaine to the solution of the question involved. *215 If it is determined that he was acting within the scope of his authority, I repeat, the question of intoxication does not enter save, and save only, as a warning to the road commission that in the future men and employees of Taylor’s habits and disposition should not at any time be entrusted with the use of state automobiles, property, or station wagons.
As heretofore shown Taylor was accompanied by an employee, John Walker, both of whom resided at Walton. In the accident Walker was injured, having received a broken arm. His employer, the state road commission, was a subscriber to the workmen’s compensation fund. Walker applied for compensation benefits and his claim was allowed and paid. The employer’s report of injury disclosed the day, hour, place and circumstances under which the injury was received, and was certified true and correct by Walker’s chief, namely, Dewey Taylor, and transmitted to the compensation commissioner by L. C. Madden, the chief engineer of the plans and survey department from the commission’s headquarters. In his letter of transmittal Madden wrote "I am transmitting Form CD-13-B covering injuries to John Walker, who is employed in the Plans and Survey Department of the State Road Commission.” Madden, himself, approved and certified as correct the application for the allowance of Walker’s doctor and hospital bills. Subsequently the compensation commissioner en'ered a formal order to the effect that Walker’s injury had been received in the course of and resulted from his employment. The claim was allowed and fully paid. The state road commission was no doubt fully conversant with the facts and circumstances giving rise to Walker’s injury and his claim for compensation, and even assisted him in securing the allowance thereof and at no time protested in any manner against the allowance or payment thereof on (he ground that his injury was not received in the course of his employment or as the result of any misconduct, or of any disobedience of any rules or instructions.
If Walker was acting within the scope of his employment at (he time of his injury, as certified to by the road commission engineer, which action, of course, would bind the road commis *216 sion itself, it necessarily follows that Taylor was also acting within the scope of his employment at the time of the accident and consequently responsible for the damages that may have been incurred by his negligent act. Being the employee of the state road commission, the principal becomes responsible and I cannot countenance the idea that any department should be allowed to "blow both hot and cold” under the conditions and facts as presented here. It is not only ridiculous, it is unconscionable to assume that Walker, who was paid compensation, was within the scope of his employment, and that the contrary position must now be assumed that Taylor was not acting within the scope of his employment in order to escape liability for the damages incurred to the claimants by the accident. Both were riding in the station wagon at the time: both were oh their way to their homes in the same town after their work for the day had been finished; both were servants of the road commission: both were acting within the scope of their employment when the accident happened, and both, so far as their relation to their master-employer is concerned, must be governed by the same rule of responsibility to innocent third persons. I repeat, if Walker was acting within the scope of his employment at the time of his accident, as certified to by the road commission, so, also, was Taylor and there can be no escape from this conclusion.
An award should be made to these seriously injured claimants and the Legislature should so act, in my opinion, to discharge a moral obligation devolving upon the state and the agency here involved.