[No. 27906. *En Banc.* July 12, 1940.]

HUGH FRANKLIN, *Appellant,* v. NORTHERN LIFE INSURANCE COMPANY, *Respondent.*[1]

[1]Reported in 104 P. (2d) 310.

542

*Ralph E. Franklin* and *Colvin & Rhodes,* for appellant.

*Preston, Thorgrimson & Turner,* for respondent.

MILLARD, J.—This action was brought to recover for the alleged wrongful cancellation of a group insurance policy. The cause was tried to the court, which found that the cancellation was wrongful, but that plaintiff sustained no damage thereby. From judgment dismissing the action, plaintiff appealed.

The facts are as follows: In 1925, a voluntary, unincorporated association, composed of certain employees of the Seattle post office and designated as the Seattle Postal Benefit Association of the Seattle post office, was organized. The purpose of the association, as expressed in the constitution of that organization, was to further the interest of its members by securing for them life and disability insurance at group rates.

Article III of the constitution of the organization provides that,

"All Employees of the Seattle, Washington, Post Office shall be eligible to membership. Such membership shall commence upon application being made to the Association by the Postal employees and shall terminate when the member severs his or her connection with the Postal Service provided that if a member is separated from the service on account of retirement under the Act of May 22, 1920, his or her membership shall not terminate but continue in force."

In all cases when a member severed his connection with the Seattle post office by transfer to another post office or branch of the postal service, the secretary-treasurer of the Seattle Postal Benefit Association was required to notify, within five days after the consum-

mation of such transfer, the Northern Life Insurance Company in writing of the change in status of such member. Each member of the association was obligated to pay dues of twenty-five cents annually for the purpose of paying the expenses of the secretary-treasurer and to compensate him for his services.

The association, through its officers, filed an application August 28, 1925, with the Northern Life Insurance Company for a policy of group insurance on the one-year renewable term plan, each policy on the life of each person insured thereunder to be in the amount of one thousand dollars. In the application is a recital that the approximate number of employees—doubtless of the Seattle post office—was 680 males and 50 females. Thereafter, individual applications were taken from individual members, including the appellant.

Pursuant to those applications, the insurance company issued December 1, 1925, to the Seattle Postal Benefit Association, its policy, which is designated as the master policy and is a group life and disability insurance policy insuring the life of each member of the association, whose name appeared on the registry thereto attached, for one thousand dollars, subject to the terms and conditions of the policy. The master policy reads as follows:

"SEATTLE POSTAL BENEFIT ASS'N. MASTER POLICY
Provisions and Benefits          Page 2
"1. Schedule of Insurance.—The amount of insurance as to each Employee insured hereunder shall be according to the following schedule: Each member who is in the employ of the United States Post Office of the City of Seattle on the first day of December, 1925, whose name is shown on the register attached hereto, is insured for One Thousand Dollars. All insurance being payable to the designated Beneficiary. Each new member is eligible for insurance after three

months continuous employment by the United States Post Office of the City of Seattle, and if application is made therefor in accordance with Sections 19 & 20 hereof, will be insured for the amount eligible, payable to the designated Beneficiary. (not in any case exceeding, however, —One Thousand— Dollars).

"2. Insurance; When and How Payable.—And the Company hereby promises, upon receipt of its Home Office in the City of Seattle, Washington, of due proof of the death, within the term of one year from the date hereof, or within one year from the date of any renewal hereof, of any such Employee while insured hereunder, to pay at such Home Office to the beneficiary as designated by the Employee the amount for which such Employee is hereby insured in accordance with the provisions hereof, and as set forth in the Register hereinafter described.

"3. Monthly Premiums.—Based upon the Schedule of Monthly Premiums herein quoted, the Monthly Premium at date of issue averages

Railway Mail Clerks Div. One ⎤
Clerks and Carriers Div. No ⎦ Dollars ⎰ and Ten ⎱ Cents
⎱ Ninety-Eight ⎰

for each $1,000 of insurance, and, for the ensuing eleven months, monthly Premiums per $1,000 of insurance for all Employees insured or becoming insured hereunder shall, irrespective of age be at such average rate. If this Policy is renewed in the manner and under the terms herein provided, either the Employer or the Company may, upon any anniversary hereof, require a recomputation of the average Monthly Premium per $1,000 of insurance according to the Schedule of Premiums herein quoted and such recomputed average Monthly Premium per $1,000 of insurance shall, irrespective of age, be charged hereunder for the twelve months of each renewal year thereafter until further recomputation is so made upon any anniversary hereof, upon requirement of either the Company or the Employer.

"4. Premium Payment.—All premiums are payable to the Company by the Employer on or before the First

day of each month, at date due, at the Home Office of the Company, in exchange for an official receipt signed by either the President, a Vice-President or the Secretary of the Company. The payment of any premium shall not maintain the insurance under this Policy in force beyond the date when the next premium becomes payable, except as provided in the next paragraph.

"5. Grace Period.—A grace of thirty-one days shall be granted to the Employer for the payment of every premium after the first, during which period the insurance shall continue in force.

"6. Unpaid Premiums at Time of Death.—In the event of the death of any employee insured hereunder, any unpaid premiums for the insurance on such Employee up to the next anniversary of the date when insurance on such Employee took effect, shall be payable to the Company by the Employer.

"7. Renewal Privilege.—At the end of the first term, and at the end of each subsequent premium paying period, the Employer may at his option continue this policy by paying in advance to the Company at its Home Office, the premium for the insuring age attained at the commencement of the policy year by each and all insured calculated according to the amount of insurance to be continued and the table of premium rates contained herein; except that at the end of five years from the date hereof, and at the end of each five-year period thereafter, the Company shall have the right to establish new premium rates for the continuance of the policy. A reduction in rate shall be effected, if experience warrants, at the end of each such period. Any reduction shall be determined by the Company and shall be based upon its classified group mortality experience. No increase in rate shall be effected except as may be determined by the Company upon the same basis.

No Agent is authorized to waive forfeitures or to make, modify or discharge contracts, or to extend the time for paying a premium.

"8. Register.—A Register shall be kept by the Company at its Home Office and shall show the names of all employees insured hereunder, and the amount of in-

surance on each of such Employees. Copy of said Register, as of the date of this Policy, is furnished to the Employer herewith and made part hereof, and copies of entries in said Register subsequent to said date will be furnished by the Company to the Employer and will thereupon become a part hereof.

"Provisions and Benefits        Page 3

"9. Certificate of Insurance.—The Company will issue to the Employer for delivery to each Employee insured hereunder an individual Certificate showing the insurance protection to which such Employee is entitled, the beneficiary to whom payable, together with a statement that in case of the termination of the employment with the Employer, for any cause whatsoever, such Employee shall be entitled to have issued to him by the Company, without evidence of insurability, and upon application to the Company within thirty-one days after such termination of employment and upon payment of the premium then applicable to the class of risk to which he belongs and to the form and amount of the policy at his attained age (nearest birthday), a policy of life insurance in any of the forms customarily issued by the Company, except Term insurance, in an amount equal to the amount of his protection under this Policy at the time of termination. Upon termination of the active employment of any Employee, his insurance under this Policy automatically and immediately terminates and the Company shall be released from any further liability of any kind on account of such person except as to the issue of an individual policy in accordance with the above provision. Re-employment will be classed as new employment in accordance with paragraph 19 hereof and a new Certificate will be issued.

"10. Change of Beneficiary.—Any Employee, while insured hereunder, may, from time to time, change the beneficiary by filing written notice thereof at the Home Office of the Company, accompanied by the Certificate issued to such Employee hereunder. Such change shall take effect upon endorsement thereof by the Company on such Certificate, and not before. In case of the death of any individual name as beneficiary, the in-

terest of such beneficiary shall vest in the Employee by whom such beneficiary was nominated. No assignment by any Employee of the insurance under this policy shall be valid.

"11. Incontestability.—The Policy, as herein defined, the application of the Employer, and the individual applications, if any, of the Employees, copies of which are hereto attached, constitute the entire contract between the parties and, except for non-payment of premiums, shall be incontestable as to insurance in force at the date hereof, after one year from the date of issue of this original contract, and, as to insurance on any new Employee, after one year from the date when his insurance takes effect as herein provided.

"All statements made by the Employer, or by any of the Insured, shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall avoid any payment under this Policy or be used in defense of a claim hereunder, unless it is contained in a written application for the insurance and a copy of such application is securely attached to this policy when issued, or delivered to the Employer to be so attached.

"12. Non-Participation.—This Policy is a non-participating contract and does not participate in any divisible surplus accruing hereon. A reduction in rate may be made, however, as previously provided herein.

"13. Modes of Settlement.—Upon the death of any Employee insured hereunder, the amount payable will, on the written request of the Employer, be withheld by the Company and paid to the Beneficiary in the manner below instead of in one sum:

"Option 1. By the payment of equal monthly instalments covering a period of two years, the amount of each instalment being $42.76 per $1000 of insurance payable and proportionately for greater or less amounts of insurance.

"Option 2. By the payment of equal weekly instalments over a period of one year, the amount of each weekly instalment being $19.40 per $1000 of insurance payable and proportionately for greater or less amounts of insurance.

"If the beneficiary shall die before all instalments shall have been paid under the option selected, the unpaid instalments will be commuted at the rate of three and one-half per centum per annum compound interest and paid in one sum to the executors, administrators or assigns of such beneficiary.

"The sums payable under the foregoing options are based upon an assumed interest earning of three and one-half per centum. Any instalments payable under said options shall participate in division of surplus interest as apportioned by the Company.

"14. Age.—In the event of the misstatement of age of any Employee there shall be an equitable adjustment of the premium.

"Provisions and Benefits          Page 4

"15. Total and Permanent Disability Benefits.—On receipt by the Company at its Head Office of due proof that any Employee insured hereunder has become wholly and permanently disabled by accidental injury or disease, before attaining the age of sixty years, so that he is and will be permanently, continuously and wholly prevented thereby from performing any work for compensation or profit, the Company will waive the payment of such premium applicable to the insurance on the life of such disabled Employee that may become payable thereafter under this Policy during such disability, and, in addition to such waiver, will pay to such Employee during such disability, in full settlement of all obligations hereunder pertaining to such Employee, and in lieu of the payment of insurance as herein provided, such monthly or yearly instalments as may be selected by such Employee by written notice to the Company at its Home Office on the following basis, towit:

"On the basis of $1,000 of insurance either

| | | | |
|---|---|---|---|
| Sixty monthly instalments of | $ | 18.00, | or |
| Twenty annual " | " | 67.98, | or |
| Fifteen " | " | 83.90, | or |
| Ten " | " | 116.18, | or |
| Five " | " | 214.00, | |

and proportionately for greater or less amounts of insurance.

"The first instalment will be paid ninety days after receipt of due proof of total and permanent disability. If the Employee dies during the period of total permanent disability, any instalments remaining unpaid shall be payable as they become due, to the beneficiary nominated by such Employee, and such beneficiary shall have the right to commute such remaining payments into one sum on the basis of interest compounded at the rate of three and one-half per centum per annum. This provision is granted without additional cost to the Employer.

"Notwithstanding that proof of total and permanent disability may have been accepted by the Company as satisfactory, the Employee shall, at any time on demand from the Company, furnish due proof of the continuance of such disability, and in case of his failure so to do, the said Employee shall be deemed to have recovered from such state of disability. In the event that the said Employee recovers from such state of disability before all the instalments hereinbefore mentioned have been paid, or fails on demand to furnish due proof of the continuance of such disability, all further waiver of premiums and payment of instalments on account of such Employee shall cease. Insurance on the life of such Employee shall then be revived, but shall be limited in amount to the commuted value, on said interest basis, of the instalments remaining unpaid on account of such Employee at the time of such recovery.

"Without prejudice to any other cause of disability, the entire and irrecoverable loss of the sight of both eyes, or the severance of both hands above the wrists, or both feet above the ankles, or one entire hand and one entire foot, will constitute total and permanent disability within the meaning of this provision.

"Schedule of Monthly Premiums Per $1000 of Insurance

| Attained Age Nearest Birthday | Premium | Attained Age Nearest Birthday | Premium | Attained Age Nearest Birthday | Premium |
|---|---|---|---|---|---|
| .. | .. | 35 | .56 | 55 | 1.66 |
| 16 | .46 | 36 | .58 | 56 | 1.79 |
| 17 | .46 | 37 | .59 | 57 | 1.93 |
| 18 | .47 | 38 | .61 | 58 | 2.09 |
| 19 | .48 | 39 | .63 | 59 | 2.26 |
| 20 | .49 | 40 | .65 | 60 | 2.45 |
| 21 | .50 | 41 | .68 | 61 | 2.65 |
| 22 | .51 | 42 | .71 | 62 | 2.87 |
| 23 | .51 | 43 | .75 | 63 | 3.11 |
| 24 | .52 | 44 | .79 | 64 | 3.37 |
| 25 | .52 | 45 | .83 | 65 | 3.65 |
| 26 | .53 | 46 | .88 | 66 | 3.96 |
| 27 | .53 | 47 | .94 | 67 | 4.29 |
| 28 | .53 | 48 | 1.00 | 68 | 4.64 |
| 29 | .53 | 49 | 1.07 | 69 | 5.03 |
| 30 | .54 | 50 | 1.15 | 70 | 5.44 |
| 31 | .54 | 51 | 1.23 | 71 | 5.89 |
| 32 | .54 | 52 | 1.32 | 72 | 6.38 |
| 33 | .55 | 53 | 1.42 | 73 | 6.90 |
| 34 | .55 | 54 | 1.54 | 74 | 7.46 |

"Provisions and Benefits          Page 5

"16. Reserve.—The Reserve for which funds are to be held upon this Policy shall be computed upon the American Experience 3½% Mortality Table with interest at three and one-half per centum per annum.

"17. Insurance to Be Discontinued.—The Employer agrees to report to the Company, in writing, not later than the 15th day of each calendar month:

"(a) The names of all persons insured hereunder, not previously reported, who shall have ceased to be in its employment since the first day of the preceding calendar month, together with the date when each such Employee left said employment. The insurance hereunder, as to each such Employee, shall be discontinued as of ........................... the date ........................... such Employee left the employ of the Employer. Lay-off or Leave of Absence, of two months or less shall not be considered, and retirement on pension shall not be considered, a termination of employment within the meaning of this Policy unless notification to the contrary shall have been given by the Employer to the Company within thirty-one days after the date when such Lay-off, Leave of Absence or Retirement on Pension shall have commenced.

"(b) The names of all persons insured hereunder, not previously reported, who since the first day of the preceding calendar month have notified the Employer, in writing, that their insurance under this Policy is to be discontinued. The insurance hereunder, as to each such Employee, shall cease as of the end of the particular insurance month during which such written notice of discontinuance was received by the Employer.

"18. Change in Amount of Insurance.—The amount of insurance on any Employee insured hereunder shall be automatically increased or decreased in accordance with the Schedule of Insurance, such increased or decreased amount to be effective on the insurance fixed at One Thousand Dollars. Where such increases or decreases in insurance are based on facts other than the length of service of the Employee, the Employer agrees to report to the Company, in writing, not later than the 15th day of the following month, the names of all employees, insured hereunder, upon whose lives insurance is to be increased or decreased, together with the data necessary to compute the amount of such increase or decrease. This paragraph shall be inapplicable, if no increase or decrease of insurance is provided in the Schedule of Insurance set forth on Page 2 hereof.

"19. Insurance on New Employees.—Each new Employee of the Employer shall be insured hereunder in accordance with the Schedule of Insurance, provided such Employee makes written application for such insurance, on forms furnished by the Company, within the time and in accordance with the provisions specified in Section 20 below; and the insurance on such new Employee shall be effective as of and from the date of the determination by the Company of the sufficiency of such evidence of insurability. The company may at its option decline to accept for Insurance any member not initially included in the Register attached hereto.

"The Employer agrees to furnish the Company, in writing, not later than the 15th day of each calendar month, the names and individual applications of those Employees, not previously reported, who since the 1st day of the preceding calendar month have made writ-

ten application for insurance under this Policy, together with the data necessary to issue such insurance.

"The name of each such new Employee, so reported, together with the amount of insurance issued, shall be entered by the Company in said Register, as of the date upon which the insurance on such Employee is to take effect.

"20. It is Hereby Specifically Agreed That:

[Subsection (a) was deleted.]

"(b) Employees not insured on the effective date of this policy must make application for Insurance hereunder in writing to the Company within thirty-one days after the date when they become eligible, under the Schedule of Insurance, to make such application. Such Employees and Employees not making application for insurance hereunder until after the expiration of such thirty-one days, or re-applying after terminating their insurance for any reason other than termination of employment, must furnish evidence of insurability satisfactory to the Company. Insurance in such cases will become effective as of and from _____the date of the determination by the Company of the sufficiency of such evidence of insurability, and upon payment of the premium, as set forth in the Schedule of Monthly Premiums herein.

"(c) The Company reserves the right to decline to renew this Policy on any anniversary when the number of Employees insured hereunder is less than fifty percent. of those eligible for insurance at such anniversary.

"21. Reciprocal Provision.—If this policy does not conform to the laws of any State where the insurance is written, it shall be held to be modified to the extent necessary to conform thereto, and any conditions herein contrary to such laws shall be held not to be any part of the policy contract, and there shall be read into the policy any further provisions essential to conform to such laws."

It will be noted that the policy provides, among other things, that it is for a period of one year; that it is renewable at the option of the association; that

the insurer may decline to renew the policy on any anniversary of the policy if the number insured is less than fifty per cent of those eligible for the insurance; that premiums are payable monthly; that each member insured should pay the same premium regardless of age; that an individual certificate would be issued to each insured.

Appellant was issued certificate No. 62, which names appellant's wife as beneficiary and states that, under and subject to the terms and conditions of the master policy, appellant, a member of the Seattle Postal Benefit Association, is insured for one thousand dollars if death occur while the member is in the employ of the United States post office of the Seattle district in accordance with the conditions of the master policy.

It will be noted that the master policy is written on a printed form of group policy such as is customarily used by the respondent insurance company in writing group insurance with private corporate employers. Where the term "employer" appears in print, it applies to the Seattle Postal Benefit Association. In the typewritten portions of the master policy, the word "member" is employed instead of the word "employee," which appears in the printed parts of the policy.

The policy was renewed each year until the anniversary of 1937, when respondent insurance company notified the association that it declined to renew the policy. The insurance company also rejected the premium tendered to it. At the time the insurance company refused to renew the policy, appellant was 72 years old, and, under standard mortality tables, had a life expectancy of 7.55 years. He was afflicted with myocarditis, nephritis, and had a double hernia. Both by reason of his age and his physical condition, he was no longer insurable.

Appellant brought this action to recover damages alleged to have been sustained as the result of respondent's refusal to continue the insurance. The affirmative defense of respondent was that it exercised its option December, 1937, under paragraph 20 of the master policy, to decline to renew the policy on any anniversary when the number of employees insured under the contract was less than fifty per cent of the total number of employees of the Seattle post office. In reply to the affirmative defense, appellant pleaded that paragraph 20 of the master policy refers to the membership of the Seattle Postal Benefit Association, not to the employees of the Seattle post office; that, if respondent's interpretation of the contract is accepted as correct, respondent's waiver since 1926— eleven annual renewals of the policy and collection of premiums therefor when, each year subsequent to 1925, less than fifty per cent of the Seattle postal employees were insured under the policy—of its right to invoke paragraph 20 of the master policy, operates as an estoppel to decline to renew the policy.

In 1925, the association had 457 members, while there were 831 employees in the Seattle post office. That was the only year in which as many as fifty per cent of the employees were insured. From 1926 to 1934, more than forty per cent of the employees of the Seattle post office were insured. In 1935, approximately forty per cent of the postal employees were insured. In 1936, the percentage dropped to less than thirty-seven per cent, and December 1, 1937, only 237 members of the association, or less than twenty-five per cent of the employees of the Seattle post office, retained their membership in the association and continued the insurance. The employees who discontinued the insurance were, as a rule, the younger members of the group.

The only right reserved by respondent to decline to renew the policy is the provision under paragraph 20 (c) of the master policy. By that provision, respondent had an option on any anniversary when the number of employees insured "hereunder is less than fifty per cent. of those eligible for insurance at such anniversary" to cancel the policy.

Respondent insists that, in the determination of the fifty per cent to which reference is made in paragraph 20 of the master policy, all of the employees of the Seattle post office must be considered, and not solely the membership of the Seattle Postal Benefit Association.

The Seattle Postal Benefit Association had the right to enlarge the scope of its activities and to pass upon the eligibility of applicants for membership in the association if the membership of the association so desired. Railway mail clerks were eligible to membership in the association. The association had members who were no longer employees of the post office. Appellant, having retired from the postal service, was not an employee of the post office. He was eligible for insurance because of retention of his membership in the association after his retirement from the postal service. The policy provides that members of the association who retire from the postal service retain their right to insurance and are also eligible to membership in the association. Such members are not employees of the post office in any sense of the word, yet they were eligible for insurance.

The master policy provides that the policy as defined in the master policy, the application of the employer (the association), and the individual applications, if any, of the employees (members of the association), copies of which were attached to the master policy, constitute the entire contract between the par-

ties, and except for non-payment of premiums shall be incontestable as to insurance in force after one year from the date of issuance of the original contract and as to insurance on any number of employees after one year from the date when his insurance takes effect. That is, the contract is contained in the master policy, the individual certificate, the application of the association, and the individual applications. The instruments are complete within themselves. A reading of those instruments—there is no ambiguity warranting resort to extrinsic evidence—is convincing that eligibility for the insurance is restricted to members of the association, and that the respondent's option to refuse to renew the policy could only be exercised if less than fifty per cent of the membership were insured.

This was not a policy of term insurance which expired on the expiration of a specific number of years, which is the ordinary and accepted meaning of term insurance. This insurance was in force as long as the premiums were paid. Failure to pay the premiums would, of course, give to the insurer the right to terminate the policy. That right is no different than the right which may be exercised by the insurer under any form of insurance policy.

The only difference between this policy and the usual forms of life insurance policies is that the premiums were not definitely fixed in a stated amount for the whole life of the policy, but were subject to adjustment either up or down, according to the average age of the insured group. Paragraph 7 of the master policy permits the insurer at the end of each five-year period to establish a new schedule of premium rates based upon its classified group mortality experience, which experience might justify either a raising or lowering of the rates. This provision of the policy was never called into use; no change was ever

made or proposed. The only other difference between this policy and the usual and ordinary forms of life insurance policies is clause 20 (c) of the master policy, which gave the right to terminate or forfeit the policy when fifty per cent of those eligible to insurance under the terms of the policy were not insured.

The very opening clause of the policy, which is the operative clause of the policy and would be controlling when in conflict with subsequent recitals (*First Nat. Bank & Trust Co. v. United States Trust Co.*, 184 Wash. 212, 219, 50 P. (2d) 904), provides that the respondent insures the life of each member of the Seattle Postal Benefit Association "(hereinafter called the Employee)." That is, the only persons insured or that could be insured under this contract of group insurance were members of the association. No other reasonable conclusion may be deduced from that clause than that the word "employee," where used in the policy, means members of the association. Let us compare the clause which permits respondent to terminate the policy (paragraph 20 (c) quoted above) with the opening clause of the policy, and to the word "employees" give the meaning which is given to that term in the first clause of the policy. Then, if we take into consideration the fact that, under the operative clause, no one could be insured except members of the association, it follows in logical sequence that respondent insurer could not terminate the contract so long as fifty per cent of the members of the association were insured.

This view is further supported by other provisions of the policy. In each instance where typewritten clauses are put in the policy, except one, the word "member" is used instead of the word "employee." The printed portions of the policy where the term "employee" is used would be lacking in meaning if they

are not construed to be synonymous with the words "member of the association."

It is a rule of general application that, if in a contract there appear a printed and a typewritten clause which are irreconcilable one with the other, the typewritten clause will prevail. *Creditors Association v. Fry*, 179 Wash. 339, 37 P. (2d) 688.

Paragraph 19 of the master policy is to the effect that a new employee would not be eligible for insurance unless he is a member of the association. The use of the word "employee" is part of the printed form but the last clause of paragraph 19 is typewritten in which the word "member" is used as synonymous with the word "employee" and reads as follows:

"The Company may at its option decline to accept for Insurance any member not initially included in the Register attached hereto."

Paragraph 11 of the master policy provides that the policy, together with the application of the employer, and the individual applications of the employees, shall constitute the entire contract between the parties. What the respondent insurer intended to say twelve years ago when it wrote the policy must be deduced from the language of the written contract, not from the parol evidence of respondent's officers and employees.

When the policy was written in 1925, the number of members of the association was about fifty-five per cent of the number of employees of the Seattle post office, excluding railway mail clerks. But during the next eleven years, 1926 to 1937, the number of members of the association was less than fifty per cent of the number of employees of the Seattle post office, excluding railway mail clerks. For those eleven years, respondent accepted premiums, during which period the members were growing older and many becoming un-

insurable. Never until 1937, during that period of eleven years, did respondent claim a right to forfeit the contract if the number insured were less than fifty per cent of the employees of the Seattle post office. This amounts to a practical construction of the contract by the respondent, for a period of eleven years, that it had no right to forfeit the policy if the membership fell below fifty per cent of the employees of the Seattle post office; and that construction overcomes all ambiguity as to the issue whether the right to forfeit when the number of employees insured under the contract was less than fifty per cent refers to all the employees of the Seattle post office or to only the members of the Seattle Postal Benefit Association. *Tone v. Parlaman,* 154 Wash. 389, 282 Pac. 208; *Fleming v. Buerkli,* 159 Wash. 460, 293 Pac. 462.

The conclusion of the trial court that respondent wrongfully breached its policy contract of group insurance in declining to renew the policy, is correct.

Was the appellant, who was one of the group insured, damaged by respondent's wrongful breach of the insurance contract?

The trial court adopted the present value of the policy rule as the measure of damages, but answered the foregoing question in the negative, on the ground that the premium rates would become so high under the group policy as to more than absorb all of the value of appellant's policy if the policy were continued to the end of appellant's life expectancy of 7.55 years.

The subject of remedy and measure of damages for wrongful cancellation of life insurance is discussed in the annotation 55 A. L. R. 1245 *et seq.,* and 107 A. L. R. 1233 *et seq.,* and the apposite authorities are there reviewed.

At page 1233 of 107 A. L. R., the means afforded to appellant for relief are stated as follows:

"The rule by the weight of authority, however, as there stated, is that where an insurer wrongfully cancels, repudiates, or terminates the contract of insurance the insured may at once pursue either of three courses: (1) He may elect to consider the policy at an end and recover its just value or such measure of damages as a court in the particular jurisdiction approves; (2) he may institute proceedings to have the policy adjudged to be in force; or (3) he may tender the premiums, and, if acceptance is refused, wait until the policy by its terms becomes payable and test the forfeiture in a proper action on the policy."

See, also, to the same effect, 32 C. J. 1263, § 461.

In the annotation 107 A. L. R. 1235, on the subject of the amount recoverable for wrongful cancellation or termination of insurance contract by insurer, the editor says:

"As pointed out in the earlier annotation, an irreconcilable conflict exists on the question of the measure of damages for the wrongful cancelation, repudiation, or termination of a contract of life insurance by the insurer. The first of the two principal lines of authority is to the effect that the insured may recover as damages the amount of premiums paid, or premiums with interest where there has been a wrongful repudiation of the contract by the insurer, and the insured has elected to rescind the contract rather than have it enforced. The other line of authority is to the effect that if the insured is still in such a state of health that he can secure other insurance of like nature and kind, his measure of damages will be the difference between the cost of carrying the insurance which he has for the stipulated term, and the cost of new insurance at the rate he would then be required to pay for a like term. As a variation of the latter rule, if the insured is no longer an insurable risk, his measure of damages would be the present value of his policy as of the date of death, less the estimated cost of carrying the same from the date of cancellation at his then age. The conflict above referred to is present in the later cases, which are set out under the following subdivisions."

The rule bottomed upon the difference between the cost of the repudiated policy and the cost of new insurance is not applicable, in view of the fact that appellant is no longer an insurable risk.

Addressing itself to the question of the measure of damages recoverable by the assured for the wrongful breach of contract of insurance, the supreme court of Oklahoma, in *American Ins. Union v. Woodard,* 118 Okla. 248, 247 Pac. 398, 400, 48 A. L. R. 102, said:

"The rule governing the measure of damages recoverable by the assured for the wrongful breach of the contract of insurance is not uniform among the several courts. One of the reasons for the lack of uniformity is the varying conditions controlling the decided cases. The particular condition applicable to the case then being considered has given rise to the statement of the rules to meet the ends of justice in the case among the parties.

"The Home Protective Association was under no obligations to enter into a contract with the plaintiff, but having entered into the contract with her, and bound itself to perform the conditions therein named, it, or its successor, must live up to the contract, or answer for damages equal to the present value of the contract to her. The insurance company entered into the contract at the time her physical condition constituted her an insurable risk with all companies, who wrote similar contracts of insurance. The insurance company carried the contract until the assured became impaired in physical condition to the point where she was no longer an insurable risk. The Home Protective Association was bound by the terms of the contract to carry the risk, and pay the loss as provided by the contract, if the assured continued in good standing as a member of the association. The assured performed all the conditions required of her by the terms of the contract. The insurance company has forfeited the contract without wrong on the part of the assured, at a time when she is not able to procure other insurance. In this situation, the assured's damage, by reason of the breach of the contract, is the present value of the contract.

The damage is determined by ascertaining the total premiums that would be required to carry the contract during the plaintiff's life expectancy, from the time of the breach of the contract, and deducting the amount thereof from the face of the policy. However, the plaintiff is entitled to a credit for interest on the total amount of premiums for a period of time equal to the life expectancy of the assured. A further sum of money equal to the interest on the face of the policy, after deducting the premiums, for a period of time equal to the plaintiff's life expectancy, should be deducted from the remainder of the face of the policy. After making the two deductions from the face of the policy, as set forth, and giving the plaintiff the credit referred to, the remainder will be the present value of the policy, and is the damage that plaintiff suffered by reason of the breach of the contract.

"We think the situation of the parties in this case requires the application of the foregoing rule to repair the damage suffered by plaintiff on account of the wrongful breach of the contract."

In the ascertainment of the present value of the policy, the trial court took the present worth of the face of the policy and deducted from that amount the present worth of the premiums necessary to carry the policy to maturity, which would be the period of appellant's life expectancy. The factors entering into that computation were: (1) the face amount ($1,000) of the policy; (2) rate of discount and interest, which the parties stipulated for this purpose is three and one-half per cent; (3) appellant's life expectancy; and (4) premium rate. The first and second items are certain. The third and fourth items must be ascertained from the evidence.

The life expectancy of appellant at the time of respondent's cancellation of his policy was, as fixed by mortality tables and as found by the trial court, 7.55 years. He was afflicted with myocarditis, nephritis, and double hernia. The rule for determination of

the life expectancy (which is a question of fact for court or jury, as the case may be) of appellant is, as held by the supreme court of Oklahoma in *American Ins. Union v. Woodard,* 118 Okla. 248, 247 Pac. 398, 48 A. L. R. 102 (we quote from the syllabus):

"The life expectancy of the assured from the time of the breach of a contract of insurance is a question of fact . . . The question is to be determined from competent life expectancy tables, and from the physical condition of the assured at the time of the breach of the contract if the latter was suffering from a bodily affliction which might prove fatal, or shorten the expectancy of the assured."

Mortality tables reflect the expectancy of an average healthy man, but life expectancy is, of course, a question of fact; and while mortality tables are given consideration in the determination of the life expectancy, the trier of the facts may take into consideration the condition of health—both mentally and physically—and may find that such condition lessens or destroys the value of the tables as evidence. That is, the mortality tables are given consideration, but they are not controlling. *Richardson v. Spokane,* 67 Wash. 621, 122 Pac. 330; *Dixon v. Haynes,* 146 Wash. 163, 262 Pac. 119, 55 A. L. R. 1218; *Roalsen v. Oregon Stevedoring Co.,* 147 Wash. 672, 267 Pac. 433.

Under the rule for determining life expectancy, it is clear that the trial court's finding that the life expectancy of appellant was 7.55 years, is not sustained by the evidence. Surely, the trial court gave no consideration whatsoever to the undisputed evidence of appellant's physical condition, otherwise the court would not have made that finding respecting the life expectancy of appellant.

Paragraph 3 of the master policy provides that each insured, irrespective of age, shall pay the same monthly premium, which premium is fixed at the rate for the

average age of the group insured. Paragraph 15 of the master policy contains a schedule of rates for all ages from sixteen years to seventy-four years. The premiums are payable monthly, and the rate remains constant throughout the year. It is necessary, in the determination of the monthly premium rate for a given year, to determine first the average age of the group, and then, by reference to the schedule, determine the rate for that age. That average rate is the monthly premium charged each of the persons insured in that group for the ensuing year. In other words, each member of the group pays the same amount of premium and not the amount of premium for his particular age. He would pay the premium rate of the average age of all of the members of the group.

Under paragraph 7 of the master policy, respondent insurance company is permitted at the end of each five-year period to establish a new schedule of premium rates based upon its classified group mortality experience, which experience might warrant either a raising or lowering of the premium rate. This provision of the policy was never invoked by respondent — no change was ever made or proposed.

During the twelve years before respondent repudiated the policy, the highest rate charged was two dollars monthly. The total premiums charged appellant and each member insured during that period amounted to approximately $165. This figure demonstrates that the finding of the trial court, that in the next 7.55 years, if the policy had been continued, appellant's premiums would aggregate $1,002.60, is not reasonable. Appellant's premium rate should be the rate for the average age of two dollars monthly and not the rate for appellant's individual age, from which it is clear that the total premiums during the remaining period of appellant's life expectancy as found by the

trial court would aggregate approximately $181.00, instead of $1,002.60, as found by the trial court.

The finding of the trial court is based upon the computation of a witness (an actuary employee of the insurer), who testified on behalf of respondent. That computation purportedly sets out the monthly and annual premiums for the years of appellant's life expectancy of 7.55 years, commencing with the age of 72 years, appellant's age on the date of respondent's wrongful termination of the policy of insurance.

That evidence cannot be accepted for the purpose to which the respondent desires to devote it. The monthly premium rates used in the computation of that witness are not the rates for the average age of the group, as provided by the policy, but are the rates for appellant's individual age, which rates are, of course, in excess of those of the average age of the group, as appellant was one of the oldest of the group insured. This witness sets up appellant's age, which was 72 years at the date the policy was canceled, and then fixes his monthly premium at the rate provided in the policy for that age ($6.38), and calculates the annual premium at twelve times that amount. Then, for the next year, the rate for age 73 is used and the next year the rate for age 74 and so on for the 7.55 years. The policy does not provide that appellant shall pay the premium based upon the rate for his age, but requires him to pay a premium based upon the rate for the average age of the group insured.

There is another reason for rejection of the computation by respondent's witness: The rates set out in the computation for the ages stated are not the rates established for those ages by the policy, but from the age of seventy-five years on include an increase of fifty per cent, referred to in the computation as a fifty per cent increase in the year 1940. This increase, the wit-

ness testified, was based upon the provision of the master policy which permits a revision in rates at the end of each five-year period; and the year 1940 would mark the end of such a period. According to this witness, the computation was prepared on the assumption that such an increase would have been made in 1940 if the policy had continued in force. He did not testify as to any facts upon which he based the assumption.

Paragraph 7 of the master policy required any revision of the rates to be based upon "classified group mortality experience." Three years of the current five-year period of experience contemplated by the provisions of paragraph 7 of the master policy had not expired at the time (1937) of the wrongful termination of the policy by respondent. What the experience may have been or would have been the next three years, cannot possibly be stated. Respondent's actuary admitted, when cross-examined, that it was impossible to forecast what the premium rates for the future years would have been, which is a refutation of his testimony that a fifty per cent increase in rates could be assumed for 1940; for, surely, it could hardly be said that the premium is inadequate when the amount of premium is not even known. The evidence on behalf of respondent does not establish that any increase in December, 1940, would be necessary. It introduced no evidence of its classified group experience under which such an increase (fifty per cent increase in 1940) could be brought within the terms of the policy.

Two five-year periods passed prior to 1937 without an attempted rate revision by respondent, the last period ending in 1935. The same conditions that obtained prior to 1935 prevailed thereafter up to the date of the cancellation of the policy. Since there was no revision of the rate schedule during the life of the policy, on what can respondent base its surmise that, if the policy

had been continued, three years after 1937 a revision would be necessary? The repudiation of its contract does not enable respondent to successfully defend that repudiation by a conjecture such as was advanced by its actuary.

Under the contract of insurance, the rate once established continues in effect year after year until there is a later recalculation and a new rate established. The repudiation of the contract was not due to any fault of appellant; and that there can be no further calculations, is not appellant's fault—the fault is that of respondent, who chose to cancel the policy. A recalculation would involve a determination anew of the average age of the group insured. The last premium rate in effect was two dollars monthly. No different rate was ever established. Under the terms of the policy, the existing rate would continue in force; hence the premium rate of two dollars monthly should be used in calculating the present value of appellant's policy.

We understand counsel for respondent argue that, because paragraph 3 of the master policy gives to respondent insurer and to the Seattle Postal Benefit Association the right of recomputation of the premium, no one can tell what appellant would have been required to pay to carry the policy to the date of his death; therefore, an accurate computation of the damage sustained by appellant cannot be had. It is true that no one knows how many would be insured or what the average would be during the succeeding years of the life expectancy. The argument is addressed solely to the method of ascertaining the damage—not to the fact of existence of damage.

It must be conceded that appellant sustained some damage. The consideration moving to him for payment of the premiums was that respondent would

pay to appellant's wife one thousand dollars at appellant's death. It cannot be gainsaid that respondent's wrongful repudiation of the contract deprived appellant of the benefit he would receive in consideration for the premiums paid by him. In those jurisdictions which hold that, under facts like those in the case at bar, the insured received no benefit for premiums paid, the measure of damages is the amount of premiums paid plus the legal interest thereon from date of each payment until date of repudiation of the policy. *Mutual Relief Ass'n v. Ray*, 173 Ark. 9, 292 S. W. 396; *Life & Casualty Ins. Co. v. Baber*, 168 Tenn. 347, 79 S. W. (2d) 36, 107 A. L. R. 1228, and list of authorities on page 1236 of 107 A. L. R.

We repeat that appellant sustained some damage by reason of respondent's wrongful breach of the insurance contract. The just and logical rule governing the measure of damages recoverable by appellant for that wrongful breach is the present value of his insurance policy, as of the date of death, less the estimated cost of carrying the insurance from the date of cancellation at appellant's then age. His life expectancy from the time of the breach of the contract of insurance is a question of fact to be determined from competent life expectancy tables and from his physical condition at the time the contract was breached. In the determination of this question, there must be taken into consideration his bodily affliction, which may prove fatal or shorten his life expectancy.

In *Larson v. Union Inv. & Loan Co.*, 168 Wash. 5, 11, 10 P. (2d) 557, we held that, where the fact that damage existed is established, and uncertainty exists only as to the extent of the damage, great liberality is allowed the court or a jury to determine the amount of the damage. We said:

"The question of whether or not damages have been proved with that degree of certainty required by the law is one of considerable difficulty, and it is not easy to reconcile all of the cases in which similar questions have been passed upon. Appellant cites many authorities in which it has been held that the evidence presented was too vague and general in its nature to support any verdict for damages. The supreme court of the United States, in the case of *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U. S. 555, 75 L. Ed. 544, said:

" 'It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.'

"The supreme court, in the case cited, clearly pointed out the distinction between cases in which the evidence as to the *fact* of the damage is uncertain and those in which the fact of damage is clearly established, the uncertainty existing only as to the *extent* of the damage. This distinction is fundamental and of extreme importance. Where it clearly appears that a party has suffered damage, a more liberal rule should be applied in allowing the court or a jury to determine the amount of the damage than should be applied in weighing evidence on the question of whether or not the acts complained of will result in any damage at all to the party upon whom rests the burden of proof."

In some insurance cases, recovery has been allowed and the damage computed, based on the life expectancy of the insured as shown by the mortality tables, which is an average or an estimate, as it cannot positively be established that any one will die at the very date of the termination of the life expectancy as shown by

the mortality tables. The life expectancy shown by those tables is merely an estimate based on an average.

It is argued that, because no one knows when appellant will die, there is no proof of what he would be required to pay to carry the policy to the day of his death. In *Scott v. Wilmeroth Service & Cold Storage Co.,* 159 Wash. 77, 292 Pac. 99, which involved question of damage recoverable for breach of contract growing out of the sale of apples, it was argued that the judgment was too large, and that there was not sufficient or sufficiently accurate proof to warrant the amount of the recovery. We said:

"It is claimed that this is too large, because there is no evidence that the growers could have sold the apples at the price the contract purchaser agreed to pay for them. But the owners were not given this opportunity. . . . The presumption is that prices of commodities remain stationary until the contrary is shown, and we cannot think that the recovery was in excess of that permissible under the evidence."

The judgment is reversed, and the cause remanded with direction to the trial court to award recovery to appellant in conformity to the rule above enunciated.

BLAKE, C. J., MAIN, STEINERT, SIMPSON, and JEFFERS, JJ., concur.

BEALS, J. (dissenting in part)—I concur with the opinion of the majority in holding that respondent unlawfully canceled the master policy of insurance. In my opinion, this policy, by its terms, contemplated the members of the "Seattle Postal Benefit Association" as "those eligible for insurance at such anniversary," referred to in paragraph 20 of the contract, subsection (c), quoted in the majority opinion. Respondent, then, could decline to renew the policy only when less than fifty per cent of the members of the association were insured.

I am not in accord with the majority as to the measure of the damages to be allowed appellant because of the wrongful cancellation of the insurance by respondent. The policy in question was both group and term insurance. By paragraph 7 of the contract, respondent had the right, at the end of each five year period, to establish new premium rates for the continuance of the policy. Under this provision of the contract, the rates might (as they did) remain stationary, they might increase, or they might be lowered. The contract provided for a reduction in rates "if experience warrants."

At the time of the cancellation, appellant was no longer an insurable risk. If he could have procured new insurance, the amount of his damage would be easy to estimate, but he was not then insurable. According to the mortality tables, his life expectancy was approximately seven and one-half years. His physical condition, however, was bad; doubtless below the average condition for his age.

In the case at bar, the presence of several factors render it well nigh impossible to determine, with any degree of accuracy, the cash value of appellant's insurance at the date of cancellation. The life expectancy of the insured, as shown in the standard mortality tables, cannot be adopted, such tables being merely an estimated average, and because, as stated in the majority opinion, appellant was laboring under serious physical disabilities, which would probably render his life expectancy less than the average at his age. At the same time, it is absolutely impossible to determine what his reasonable life expectancy then was.

Under the peculiar circumstances of this case, I am convinced that it should be held that the measure of

appellant's damage should be the return of the premiums which he paid, with interest. In reaching this conclusion, I take into consideration the fact that the policy was, in effect, term insurance, and that the premiums which appellant paid were subject to be increased. As stated in the majority opinion, many courts have adopted this measure of damages. It is my opinion that, in such cases as this, the rule stated is both the majority and the better rule. *Mutual Relief Ass'n v. Ray*, 173 Ark. 9, 292 S. W. 396 (cited in the majority opinion). This measure of damages is simple, easy of computation, and its application does not require any estimate as to the probable life span of the insured, concerning which only a guess can be made.

For the reasons stated, I am not in accord with the opinion of the majority, in so far as the same fixes the measure of damages to be allowed.

ROBINSON and DRIVER, JJ., concur with BEALS, J.