[No. 30151.  Department One.  July 17, 1947.]

ANGELES GRAVEL & SUPPLY COMPANY, *Respondent*, v.
CROWN ZELLERBACH CORPORATION, *Appellant*.[1]

[1]Reported in 183 P. (2d) 482.

*Bogle, Bogle & Gates, Stanley B. Long,* and *Thomas L. Morrow,* for appellant.

*Wettrick, Flood & O'Brien* and *Wm. J. Coniff,* for respondent.

SIMPSON, J.—Plaintiff instituted this action for the purpose of recovering damages arising out of injury to a scow owned by it, for loss of use thereof occasioned by the injury, and for necessary repairs. Defendant admitted the injury but defended upon the ground that the damages resulted from the unseaworthiness of the scow. Defendant filed a cross-complaint for damages resulting from plaintiff's breach of warranty in furnishing an unseaworthy vessel.

The cause was tried to the court, sitting without a jury. At the conclusion of the trial, the court made its findings of fact, conclusions of law, and, based thereon, entered its judgment in favor of plaintiff. Defendant's assignments of error challenge the correctness of the court's findings and judgment.

It is necessary to summarize the agreed facts and a portion of the evidence which is in dispute. Respondent is a Washington corporation, engaged in general contracting in Port Angeles, Washington, and operates scows and pile drivers on the Sound waters between Port Townsend and Neah Bay. It had operated the scow in question for some ten or twelve years. Appellant is a Nevada corporation, engaged in the manufacturing business at Port Angeles. On or about January 3, 1942, respondent rented its scow, upon which was erected a pile driver, to appellant at a charge of fifteen dollars per day "to take it to Neah Bay and bring it back, and to operate it while there." The rental agreement was made by H. J. Goodrich, representing appellant, and Fred Owens, vice-president of respondent corporation. At 12:45 a. m., January 4, 1942, the scow was towed by appellant from respondent's dock at Port Angeles to the spit which extends out into the Port Angeles harbor. From that point, at 4:00 a. m. on the same day, the tug got under way, with the scow in tow. Shortly

afterward, the scow was seen to list, and then capsized at 7:57 a. m.

The appellant company had used the scow for similar purposes on prior occasions. It was twenty feet wide, sixty-five feet long, and four feet deep over the lead at the front. The bottom was made from 3 by 12 planks, and was reinforced by two bulkheads that extended the length of the scow. The decking was two inches thick. The scow was equipped with a hoist engine placed near the center, on skids, eight inches above the floor. The engine was operated by steam, and burned oil. In the front were the leads—that is, the guides for the hammer that runs up and down. The leads were sixty-five feet high and had a spread of twenty feet at the bottom. They were fastened to a big timber which was bolted on the front of the scow. There were two guys attached to the scow "to hold it from going ahead in a storm." There were three hatches that gave access to the bilge. A steam jet pump that pumped an inch pipe full, was another part of the regular equipment.

Mr. Owens testified that he did not make any representation concerning the condition of the scow, and that it was agreed that appellant should install an extra pump and put a man on to watch it. He testified that, at the time it was rented, the scow was in good condition and was not leaking. Mr. Goodrich also testified that there was no water in the hold or bilge. Before the trip was started, the extra pump was installed to be used by the guard. Mr. Owens explained that the extra pump was put on as a matter of precaution.

Gus Lundberg, an employee of respondent for nineteen years, was the tugboat captain and manager for respondent. He stated that the scow was in good condition before it was rented to appellant. He moved the additional pump placed on the scow by appellant to a position where it could be used in case it was needed. Mr. Lundberg also testified that, before the scow went out, he had made a thorough inspection of it, and also prepared it for the trip to Neah Bay; further, that it was in every way in good condition.

Arnold Tweter was the captain of the tug that towed the scow, and had had many years of experience in the straits of Juan de Fuca. He testified that the scow appeared to be in good condition when he took it in tow. The weather was good, there was no wind, and they were traveling against a flood tide. The pile driver started to list at 7:55 a. m., and soon afterward turned over. He said that his speed was about six miles per hour.

Expert witnesses testified that water coming into a vessel would cause it to overbalance and then capsize. There was no direct evidence which explained the cause of the sinking.

Walter Eastman was the watchman employed by appellant. He had had some experience with gas engines and pile drivers, but none with towing or handling scows. He testified that the pumps were in good working condition when he left the spit on the way to Neah Bay. His recital of the sinking of the scow is not of material help in arriving at a decision. He stated that he cut some wood on two occasions, and that he operated the pumps, but did not get much water through the pipes.

Captain L. C. Perry, an expert, made an examination of the scow after it had been returned and beached at Port Angeles. When he made his examination, the boat was about half or two thirds of the way out of water. He said he found that some of the caulking

"... had been pushed inward and was hanging out of the seams, and as I worked around in there I found it rotten more or less is the term we use. Q. You are referring to the caulking? A. Yes. Some of the planking *were* worm eaten and the seams were wide open as we would term it, and I recollect seeing a light outside,—where that light came from I don't know but at the time I thought it was the other gentleman outside with a flashlight, and I could see the reflection on the beach."

It was his opinion that the accident was caused by the caulking giving way, which allowed the water "to enter in such an amount that the pumps could not control it and the scow's stability was disturbed and she capsized."

Mr. Owens, who testified as an expert, stated:

"Q. What in your opinion would be the dangers incurred by the driver in the event the tug should exceed four miles an hour and be driven at 6 miles. A. I take it that the maximum strain that should be put on would be developed at four and if there is any swells encountered the strain is increased past the maximum, to increase it two knots you would have to increase the towing power five or six times. It will take the 75 horse power to pull the four knots and to increase it two miles more you have four or five times the pull to get that extra two miles so that if the maximum is enough at four and you increase it to six or seven say six you are going to put a strain away beyond what in my opinion is safe to pull. Q. That extra strain as a result of the extra speed from four to six imposes what danger to the driver? A. It is only four feet deep in the middle and three at the towing bits or towing end and when you fasten the tow bits in that three foot end and when you put that extra strain you are liable to strain the caulking, at the towing part of the lead, they are hanging up and you are going at four and increase it to six the whip on the leads increases enormously. Q. What effect does that have on the structure of the scow? A. You are whipping those leads and are very likely to open the caulking up in the corners of the scow. Q. Sufficient to let it take in water? A. Yes and that does happen. Q. Is there any variation in the tension or strain from the pull exerted against the scow as a result of the ground swell that you say are almost always encountered? A. Yes that pulling power on the back end of the driver would increase almost double. Q. Had the turn of the wheel is that in constant revolutions of what? A. That will be from 75 to 100 and when we are pulling and we encounter a wave and we start down we increase the wheel and the boat picks up speed, it is attached to the scow and the more pull is applied to the tow line the more pull there is on the driver to the scow and the scow may be coming up when we are going down and it will yank the scow, you see the scow follows the boat."

Mr. Owens was supported in his conclusion by Floyd Johnson, a man who had had many years experience in operating tugboats and towing scows.

John Lunberg, the shipwright who repaired the scow in question, testified that the bottom planks were not decayed, caulking was "pretty compact," and that there was

nothing about the hull that would have admitted a great amount of water in a short time.

An expert, Captain Floyd Johnson, gave it as his judgment that the maximum speed should have been not to exceed four and one-half miles per hour.

Harry Cotton, an operator of pile drivers, scows, and tugs on Puget Sound for over forty years, who had been engaged by appellant's underwriters to make a survey and report the loss of the scow in question, testified as follows concerning the danger incident to towing a pile-driving scow:

"Q. Having in mind the testimony given by the experts whom were named a while ago, and your own experience in the operation of scows and water drivers and tug boats to which you have testified,—Will you state what in your opinion caused the water driver here to capsize at a point near 'Low Point?' A. Well many conditions could cause a pile driver to tip but under ordinary conditions it will not capsize, it is usually too much water, it has to be a considerable amount at that. Q. How much water would you say? A. Well, outside of a big storm, a pile driver will not capsize until the water in the hold brings the floor part to the level of the water. As soon as the water gets so that it will cover over the deck a driver is helpless and it will tip over on one side or the other. I have taken drivers to Neah Bay and got through in a storm and didn't have to turn in, but I will say that our pumps are steam fitted. If your pumps are sufficient and working you can keep the water out. I haven't been in any storm where we couldn't keep the water out. I would never go out with a scow west of Port Angeles without putting a man on to watch, but I have gone all around up around Seattle where you don't have the ground swells and never put a watchman on, and I have been where the water was almost level with the deck and gotten through all right. . . .

° "Q. What do you say in your judgment is a safe method of procedure to handle the pumps in order to protect it against water? A. Unless something has happened to a pile driver and scow any ordinary pump will take care of any water, practically any scow when it gets into a ground swell and gets working it will begin to take water, a pile driver that has been bone dry will get two feet in a ground swell and will begin to work back and forth and it will

take water but with an ordinary pump that is easy to keep dry."

Following the introduction of evidence, the trial judge made a memorandum opinion, in which he reviewed the evidence and announced his conclusion that:

"The cause of the accident was due to leakage into the hull and the only question was whether this was due to faulty hull condition and was a condition which could not have been rectified by the use of the pumps, or whether it was ordinary leakage which could be expected in a barge of this kind and which could and should have been taken care of by the pumps which were aboard.

"I think the evidence shows that the latter situation was the cause of the loss. While the watchman aboard the driver testified that he frequently used both pumps, the last time not more than ten minutes before the barge capsized, I think the evidence indicates that this could not be true. The tug-boat captain, who kept the barge under careful scrutiny testified that he did not see the watchman use the pumps. When the barge was finally beached, the evidence indicates that even then the hull was in sufficiently good condition so that the pumps aboard, if properly and seasonably worked would have discharged all the water which could have been taken aboard."

The court's findings of fact followed very closely the ideas contained in the memorandum opinion.

■ This is a typical case for the application of our oft-repeated rule, that this court will not reverse the trial court on questions of fact unless the evidence preponderates over the findings of the court. *Guenther v. Equitable Life Assur. Soc.*, 23 Wn. (2d) 65, 159 P. (2d) 389.

■ In the case at bar, it appears that two different views were entertained by the various witnesses concerning the cause of the accident to the scow. The trial court was convinced that the reasons given by respondent were compelling. We accept the court's decision. The evidence convinces us that the injury to the scow was caused by straining due to excessive speed while "bucking" the tide, and neglect to properly work the pumps on the scow.

■ Appellant argues that the bailment carried with it an implied warranty of seaworthiness on the part of the

respondent, and that an unseaworthy vessel was furnished to appellant. The question of whether or not a vessel is seaworthy is one of fact, to be ascertained from the evidence introduced at the trial. *Hanrahan v. Pacific Transport Co.,* 262 Fed. 951; *American Merchant Marine Ins. Co. v. Margaret M. Ford Corp.,* 269 Fed. 768; *Henry Gillen's Sons Lighterage v. Fernald,* 294 Fed. 520; *The Framlington Court,* 69 F. (2d) 300.

■■ The evidence in this case shows that the scow was in good condition and seaworthy when delivered to appellant. Aside from that fact, it is admitted that appellant's agents made a minute survey of the vessel and ascertained its condition before it was started on its trip to Neah Bay. In such cases, the law does not imply warranty of reasonable fitness or capability of the chattel. This holding is in accord with the rule laid down in the cases cited in 31 A. L. R. 544.

■■ After the scow was returned to Port Angeles, it was repaired by respondent at considerable expense. The court found that the cost of repair was arrived at by appellant after calling for bids to repair and agreeing to pay the amount of the bid. There is a conflict in the evidence relative to the agreement to repair. The trial court decided the question in favor of respondent, and we are unable to discover any reason for disregarding its holding. Moreover, the damage was caused by appellant, and it was in duty bound to repair and return the scow in the condition in which it was when rented.

■ Another contention made by appellant is that it should not have been charged for loss of the use of the scow between the time it capsized and the time when it was fully repaired. The court based its judgment on the number of days elapsing between the time the appellant obtained the boat and its repair, and allowed respondent fifteen dollars per day for that time. We find no error in the court's finding in this regard. Appellant rented the scow for fifteen dollars per day, and was bound by its contract

to pay the daily charge until respondent again had the use of its property.

The judgment of the trial court was entirely correct, and it is accordingly affirmed.

MALLERY, C. J., MILLARD, HILL, and ABEL, JJ., concur.