[No. 30997. *En Banc.* February 25, 1950.]

SIDNEY BARRINGTON, *Respondent,* v. WILLIAM T. MURRY, *Appellant.*[1]

*Christ D. Lillions,* for appellant.

*Koenigsberg & Oseran,* for respondent.

SIMPSON, C. J.—Plaintiff, as assignee, instituted this action to recover the sum of $3,580.89 from defendants, which sum had been advanced to them by Oscar Tjersland, Jewell Gibson and S. C. Barrington. A trial to the court, sitting without a jury, resulted in the entry of a judgment favorable to plaintiff.

[1]Reported in 215 P. (2d) 433.

The findings of fact made by the court, twenty-five in number, were very full and complete. They recite that certain named individuals, namely, Oscar Tjersland, Jewell Gibson and S. C. Barrington, acting as joint adventurers, had contributed "joint capital" and had empowered plaintiff to employ such persons and make such contracts as he might desire. Plaintiff thereafter employed Charles Hill Johns, who then acted with plaintiff in order to carry out certain business transactions for the joint adventurers. This continued until June, 1947, at which time Alair Engines, Inc., was incorporated and assumed the business of the joint adventure. In the spring of 1946, Johns had discussions with the defendant relative to the conversion of Allison Aeroplane engines. Pursuant to a telegram dated July 29, 1946, defendant journeyed to Seattle, where he became acquainted with plaintiff and

"did advise the plaintiff that he virtually owned the Alaska Machine Tool Co. and did orally warrant:

"1. That the defendant W. M. Garrison was an expert mechanic.

"2. That the Alaska Machine Tool Company was fully equipped to do all machining necessary to make a diesel conversion out of an Allison airplane engine, and had already made such a conversion on an Allison engine, which was in successful operation in a boat.

"3. That upon making such conversion, the Allison engine would operate successfully on diesel oil and would be a practical unit to place in boats or for other commercial purposes." (Finding X.)

"That in addition to confirming the warranties theretofore made by William T. Murry, said Murry and Garrison did agree that a conversion could be accomplished at a maximum cost of $1500.00, and that the first conversion could be made within the course of twenty-one (21) days." (Finding XIII.)

Thereafter, there was, at the direction and request of defendant, paid out of the joint adventure fund the sum of $2,080.89. And on September 9, 1946, fifteen hundred dollars was sent to defendant in order to complete the conversion of an aeroplane engine.

"That for a period of almost one month the two defendants William T. Murry and W. M. Garrison did try to start the engine; that after many attempts, it commenced to operate for perhaps two minutes at a time, and then the oil would ooze through between the cylinders and pistons, and puffs of black smoke from the oil would permeate the atmosphere, and the engine would stop; that finally the said two defendants did abandon the conversion as an utter failure." (Finding XXII.)

"That the Alair Engines, Inc. has assigned the claim herein to the plaintiff, and plaintiff sues on said assigned claim." (Finding XXV.)

The court further found that Garrison was in Alaska when the action was instituted and could not be served with *summons and complaint.*

Based upon the findings, the court made conclusions of law and entered judgment in favor of plaintiff and against defendant Murry in the sum of $3,580.89 with interest.

Defendant appealed, and in so doing has assigned errors which are sufficient to challenge the correctness of the findings and the judgment.

We set out the essential portions of the evidence. Appellant, before coming in contact with respondent, owned a half interest in the Murmac cocktail lounge in Anchorage, Alaska. He and his wife were divorced several years ago and for that reason Murry is the only appellant.

Respondent, a steamboat captain, has been a resident of Seattle for sixty-eight years. In February, 1946, Oscar Tjersland, Jewell Gibson, and S. C. Barrington and associates deposited with respondent the sum of seventy-five thousand dollars. This sum was to be used, as directed by Barrington, in certain business enterprises. (July 3, 1947, the above named parties with others formed a corporation known as Alair Engines, Inc. At that time, the assets mentioned were turned over to the new company, and the claims against appellant were assigned to respondent.)

After receiving a deposit from his coworkers, respondent employed Charles Hill Johns, who went to Alaska for the purpose of investigating the advisability of purchasing surplus aeroplane engines. Respondent placed at Johns'

disposal the sum of eighteen thousand dollars, with which Johns opened an account in his own name in the Bank of Alaska at Anchorage. While in Alaska, Johns met appellant, who tended bar in the Murmac cocktail lounge. Appellant learned the purpose of Johns' trip to Alaska and then told him he had a mechanic named Garrison, who had successfully converted an Allison engine to a marine engine.

Johns returned to Seattle and July 29, 1946, sent a telegram to appellant which read:

"HAVE EXPECTED YOU AND GARRISON FOR WEEK AM MARKING TIME WAITING ON YOU THIS DEAL IS HOT BOTH OF YOU COME AT ONCE REGARDS."

Shortly thereafter, appellant journeyed to Seattle where he met respondent at respondent's home. Barrington testified that at that time Johns stated in the presence of appellant:

"Mr. Murry owned a machine shop, or practically owned a machine shop or had loaned a lot of money. And he said that he had an engineer partner who had taken an Allison engine and made it into a diesel engine. And that was the purpose of his coming out to the house.  .  .  .

"Q. [To respondent.] What did Mr. Murry tell you? A. Mr. Murry told me that he had a machine shop in Anchorage. Q. (The Court) He told you that who had? A. He had it, a machine shop in Anchorage, and he had a partner could convert such an engine, but that in fact he would bring his partner down and make a figure on it because he was an engineer. Q. Did he tell you anything about whether or not any conversion had already been made at his place? A. Yes. He told me they had a boat with such an engine, they had taken down the engine and they made it so that diesel oil drove her, and she was then running in close to there, somewhere up there as a fishing boat.  .  .  .

"Q. What did Mr. Murry tell you he would do as far as getting Mr. Garrison? What conversation was there with reference to Garrison? A. Mr. Murry went to my phone and phoned Garrison at Anchorage, Alaska and asked him if he would come down on this deal. He said yes, that he would fly down, and in the next two or three days he flew down. Q. When he got down were there some conferences at your place? A. Yes, there was. Q. Who were those conferences between? A. Between Murry, Garrison, Johns and myself."

Respondent stated that appellant first told him that it would cost one thousand dollars for the conversion, and that a check, marked exhibit 8, in the amount of one thousand dollars was made payable to W. M. Garrison, signed and delivered at appellant's request. Another check for five hundred dollars was issued under the same circumstances. Another check for $580.89 was made to pay Garrison's expenses and the freight on the engine when it was shipped to Seattle.

Respondent also testified concerning a telephone conversation:

"Q. And who was on the other end of the wire? A. Mr. Murry. Q. What did he say? A. He said, 'Sid, *we* are short of money for our payroll and *we* would like to have $1,500 more.' And I said, 'Would you make a guarantee that you would put the engine up for $1,500 and not any over that?' He said, 'Never fear, *You have Murry's word for guarantee*', and I said, 'All right. Fine. I will send you $1,500.' Q. Then what did you do? A. I got Owens to phone to Charles Hill Johns and he got on the phone and got Charles Hill Johns and he told him. He told him that on the phone and he stated that he would send $1,500." (Italics ours.)

September 22, 1946, appellant sent a telegram addressed to Charles Hill Johns as follows:

"PLANNED ON TEST TONIGHT FLY TO SEATTLE SUNDAY BUT A BUG DELAYED EVERYTHING EXPECT TO TEST SUNDAY AND FLY SOUTH MONDAY STOP NOTHING SERIOUS JUST MINOR DELAYS STOP THE ENGINE WILL OPERATE SUCCESSFULLY HAVE NO FEAR STOP WITH BUT THE ONE ENGINE TO WORK ON MUST EXERT EXTREME CAUTION ON EACH MOVE WILL ARRIVE SEATTLE MONDAY OR TUESDAY REGARDS          MURRY AND GARRISON."

Jewell R. Gibson testified that Murry told him he would guarantee the return of the money if the converted engine did not operate. Both Gibson and respondent testified that at another time Murry guaranteed the return of the money advanced, and offered to deliver them a truck in payment, or as security.

When the engine arrived in Seattle, it was taken to the Buckman Machine Shop. It was set up in that shop, and Mr. Buckman, in addition to establishing that the engine

was first brought to his shop, stated that appellant and Garrison couldn't get the engine to turn over when it was first brought in, and that they worked on it for several weeks, during which period they made some hundred attempts to operate it, but were completely unsuccessful in getting it to run more than a total of three or four minutes at any one time. He testified further that they finally abandoned the engine, at which time it was worthless. The events there are best related by the following excerpts from the evidence.

Mr. Buckman, a machine shop operator for thirty years, testified that it was apparent that some work had been done on the engine, and that certain parts had been added. He testified as follows:

"Q. Those parts that were added and put on the engine, how did they look as to workmanship? A. They didn't look very good as far as their value was concerned. Q. Did they look as tho they had been made by a first class mechanic or not? A. I wouldn't say it was a first class job."

Guy Foster, another mechanic, likewise testified as follows:

"Q. And all of that was—it appeared to be added to the machine, did that look like a first class job or not? A. I wouldn't call it a first class job. Q. How would you classify it? A. It was so that just anyone looking at it could tell it was rather amateurish."

The following testimony of Mr. Gibson is to the same effect:

"Q. What was done to the engine at the machine shop, if anything? [Interjection by counsel and court.] A. The engine was sitting in the machine shop and I went to look at it. It looked amateurish and badly made to me. Q. What did you notice on it particularly? A. The manifold and the carburetion. Q. Those were the things that appeared to be bad in the engine? A. Yes sir. Q. How did it work? A. It looked very amateurish. I am an airplane pilot myself and they couldn't get the engine working when they started it."

Typical of the testimony regarding the failure of the engine to operate are the following excerpts from the record.

Mr. Gibson testified as follows:

"Q. Did they ever try to start up the engine when you were there in the morning in your presence? A. Yes sir. Q. And did it work or operate? A. No, it did not. Q. What would happen on each occasion? A. The same thing. It would fill full of oil and overflowed with oil. It would not work."

And respondent's testimony is as follows:

"Q. Did they try to run it? A. Yes. Q. Who tried to operate it? A. Murry and Garrison. Q. What happened when they tried to operate it? A. Everybody had to run to the other end of the machine shop because of the fumes that blew from it there. That is a fact. Q. When that happened did it turn over? A. No. They had to keep a little distance because blue smoke from the oil came out of the cylinders, came up through and plugged up everything."

Mr. Gibson testified that both appellant and Garrison tried to operate the engine, usually with appellant on the crank and Garrison manipulating the carburetion. Mr. Buckman testified as follows:

"Q. (The Court) Did Mr. Murry help try to operate it? these times? A. They both of them were there. Q. (The Court) All of the times? A. Yes, most of the times, at any rate ninety per cent of the time. Mostly they were together."

To the same effect is Mr. Foster's testimony:

"Q. During the time that you were there were Mr. Garrison and Mr. Murry there most of the time? A. Yes. Q. Which one was there? A. They were together most of these different times. Q. When you noticed them they were together? A. They were together the larger part of the time."

Garrison, appellant's associate, testified:

"Q. The reasons they wanted you to convert the engine was because *you and Murry both told* Mr. Johns and told Captain Barrington that you had converted one of these engines before and it was successfully operating in a boat, didn't you? Isn't that the reason? A. That is one of the reasons, yes. That is one of the reasons, that is correct." (Italics ours.)

Appellant and his witnesses contradict the evidence to which we have referred. Appellant stresses the importance

of a letter written August 30, 1946, from Johns to appellant. That letter reads:

"Dear Billy:—

"Well, my friend I'm on the go as you can see. Things are moving fast for me, and all now depends upon Garrison and his conversion. That is the key to the success of my deal.

"You know Billy that I know nothing about engines, and I know you know little more than I, but I want to ask a favor of you. As a friend of mine see that Gary stays on the job. Stay on his tail and get him to complete this conversion 'pronto.' As you know I've paid him in advance, and the only thing I'm fearful of is that he will get off on some other business and delay my work. Time is the essence of my deal.

"Then as I told you before it would be an excellent idea for you to learn all you can about the Garrison conversion. The reason for this—again let me say—is that when Gary gets this engine converted I know there is a tremendous market for the conversions—presupposing they are as Gary says they will be. That is where you come into the deal. As we discussed, the marketing of these converted engines will afford a golden opportunity to make a pile of money and you are in on the 'kill' if, as & when that time comes. But all depends upon Garrison. He must do this job for me ok & perfectly.

"I have all the confidence in the world in you Billy—so—get out your 'Black Snake' and don't let Gary shuffle his feet.

"Must run now and catch a plane. Regards to all my friends.

"Sincerely,
S/"Chas. Hill Johns
"P. S. Play the 'Gypsy' for me—Johnny."

We do not attach much importance to the letter. It was written by Johns, who had no authority to bind the joint adventurers, Tjersland, Gibson and Barrington. True, Johns did, on July 1, 1947, become one of the incorporators of Alair Engines, Inc., but at the time he wrote the letter to Murry, he was but an employee of respondent, who, in turn, represented Tjersland, Gibson and himself. In any event, the letter did not dispute to any great extent the evidence produced by respondent and his witnesses.

■ The evidence considered in its entirety does not preponderate over the findings made by the trial court. Therefore, we must accept the findings as verities. *Olsen v. John Hamrick's Tacoma Theatres,* 9 Wn. (2d) 380, 115 P. (2d) 718; *Stangle v. Smith,* 10 Wn. (2d) 461, 117 P. (2d) 207; *Sloop v. Thomas,* 20 Wn. (2d) 409, 147 P. (2d) 511; *Angeles Gravel & Supply Co. v. Crown Zellerbach Corp.,* 28 Wn. (2d) 428, 183 P. (2d) 482; *In re Martinson's Estate,* 29 Wn. (2d) 912, 190 P. (2d) 96; *In re Gallinger's Estate,* 31 Wn. (2d) 823, 199 P. (2d) 575.

■ It must also be borne in mind that the finding of the court upon the facts "shall be deemed a verdict." Rem. Rev. Stat., § 368 [P.P.C. § 98-3.]

■ The evidence and the findings clearly indicate that appellant and Garrison was engaged in a partnership or a joint venture. They, acting together, induced respondent to advance them certain sums on the definite representations that the converted engine would do the work of a commercial Diesel engine. This was done in two ways: (1) by direct representation; and, (2) by a guarantee that the money in any event would be returned to respondent and his associates.

■■ The activities of appellant and Garrison bring them well within the following rule laid down within *Paulson v. McMillan,* 8 Wn. (2d) 295, 111 P. (2d) 983:

"A joint adventure is in the nature of a partnership. The relations of the parties in each of such associations are so similar that their rights, duties, and liabilities are generally tested by the same rules. . . .

"It is, of course, unnecessary that every member of a partnership must be able and qualified to do every act required to further its general purpose. For example, one can undoubtedly be a partner in the business of manufacturing watches without being himself able to make a watch or the simplest part thereof."

See, also, *Dingle v. Camp,* 121 Wash. 393, 209 Pac. 853, *Poutre v. Saunders,* 19 Wn. (2d) 561, 143 P. (2d) 554 and *Priestley v. Peterson,* 19 Wn. (2d) 820, 145 P. (2d) 253.

The judgment of the trial court was correct and is affirmed.

ALL CONCUR.

March 31, 1950.   Petition for rehearing denied.