[No. 2786-1.    Division One.    June 23, 1975.]

GEORGE C. RAINS, *Respondent*, v. L. J. WALBY, *Appellant.*

*Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle* and *Alfred J. Schweppe,* for appellant.

*Loucks & Lamb, P.S., Dan B. Oros, Niichel & Cossell, P.S.,* and *Richard J. Niichel,* for respondent.

CALLOW, J.—George C. Rains, plaintiff, initiated this action against L. J. Walby and the estate of Joseph H. Lewis, defendants, for an accounting pursuant to an agreement

dated January 12, 1957, or, in the alternative, pursuant to an agreement dated January 7, 1958. The claim against the Lewis estate was settled and the matter proceeded to trial between the plaintiff Rains and the defendant Walby on stipulated facts.

In 1955, Rains was the holder of options to purchase two parcels of land and timber on the Osa Peninsula in Costa Rica. One parcel known as the Gutierrez Timberlands contained 108,000 acres, and the other parcel known as the Secondary property contained 10,000 acres. Rains invested his time and money in locating land and reported on the results of his investigations to Lewis, who was interested in financing land and timber purchases. Walby subsequently associated with Lewis, and these parties entered into three contracts.

On January 12, 1957, Lewis and Walby, the defendants, entered into an agreement with Rains, the plaintiff, to share any profits to be made on Costa Rican transactions. The agreement recited that it had been agreed previously between Lewis and Rains that if Lewis purchased any of the property, by himself or with others, which Rains had located in Costa Rica, then Lewis, after deducting expenses and costs, would share any profits he might make from resale or development of the property on an equal basis with Rains. It was recited that Lewis desired to finance the purchase of the Gutierrez tract, and that Rains had transferred his interest in the option to Lewis. There was a further recitation that Lewis had entered into an agreement with Walby wherein Walby had an equal interest with Lewis in any holdings that Lewis might acquire in Costa Rica as a result of this plan. The agreement finally recited that Lewis would manage all transactions arising out of it. Following these recitals, the parties agreed that:

1. Profits on "any and all transactions" then pending or arising in the future in Costa Rica would be shared, half between Lewis and Walby jointly—50 percent—and the other half would go to Rains—50 percent;

2. Rains would be entitled to receive from Lewis and

Walby an accounting of all such transactions on request;

3. Rains would enter into an agreement with Lewis and/or Lewis and Associates and H. E. Tenzler supplemental to this agreement, payments provided for therein to be in addition to the payments provided for in this agreement;

4. heirs, devisees, and assigns were bound by the agreement, and

5. Rains gave Lewis the power to manage all transactions.

On the same day, January 12, 1957, Lewis and Walby and H. E. Tenzler entered into an agreement with Rains concerning the acquisition from Rains of the option to purchase the 10,000-acre Secondary tract. This agreement was supplemental to the previously described agreement. It was agreed that Lewis, Walby and Tenzler would pay for assignment of the option to them, would purchase the property, and would develop the Secondary property in conjunction with development of the Gutierrez Timberlands. The details of this agreement will be discussed further.

The third contract was entered into on January 7, 1958, between Lewis, Rains and Walby. The recitals of the contract of January 12, 1957, pertaining to the Gutierrez Timberlands were reiterated almost verbatim, and then it was agreed that "in consideration of the mutual covenants herein contained" that:

1. Profits on Costa Rican transactions were to be shared between Lewis, Rains and Walby on an equal basis—33⅓ percent to Lewis, 33⅓ percent to Rains, and 33⅓ percent to Walby;

2. Rains and Walby would be entitled to receive from Lewis an accounting of all transactions upon request;

3. Rains had turned over to Lewis and Walby the option agreement regarding the purchase of the Secondary property, which had then been purchased by Lewis and Walby, and that this property was now included in this agreement "on the same basis as the Gutierrez Timberlands";

4. heirs, devisees, and assigns were bound by the agreement;

5. Lewis was given the power to manage all transactions, but if he was unable to act, then control would be "jointly between" Walby, Rains and the personal representative of Lewis;

6. the agreement was to supplement and take the place of the agreement of January 12, 1957.

After these agreements were executed, in order to finance the purchase of both properties, Lewis sold 50 percent of the venture to W. H. Gonyea of Oregon and Jay Pritzker of Illinois. Pritzker and Gonyea were then the joint owners of a 50 percent interest, Walby was the owner of 25 percent, and Lewis was the owner of 25 percent. In 1959, at a meeting in Oregon, Walby sold his interest to Gonyea and Pritzker, leaving Gonyea and Pritzker as the owners of 75 percent and Lewis as the owner of 25 percent. Rains was unaware of this meeting or of the sale of Walby's interest to Gonyea and Pritzker, which gave Walby a substantial profit.

In addition to the facts as related, the trial court further found:

5. That Rains had fully performed all duties and obligations which were the object of the 1957 agreement, prior to entering into the 1958 agreement. The only duties and obligations remaining were the responsibility of the first party, i.e., Walby and Lewis.

6. That Rains received no benefits, nor did Walby assume any additional responsibility or give up any right detrimental to him by the 1958 contract.

7. That the 1957 profit-sharing agreement terminated with Walby's sale in 1959.

8. That since 1957, Walby has recognized and has admitted in his deposition, Rains' right to share in profits made by Walby when their joint venture terminated.

. . .

11. That Joseph H. Lewis died in 1968.

12. That no profits have ever been paid to Rains.

The assignments of error present as issues:

1. Was Rains entitled to share in profits made by Walby under either agreement?

2. Was the agreement of January 7, 1958, unsupported by consideration so that the 1957 agreement controlled?

3. Was the action for an accounting premature?

The initial contention is that Rains cannot recover a share of profits under either agreement. It is argued that under both agreements there was only to be a sharing of profits that Lewis might make on a sale or development of the property, and not a sharing of the profits that Walby might make. We interpret the agreements as conveying the meaning found by the trial court.

We first observe that the trial court was correct that neither the 1957 nor the 1958 agreement required that a party be physically present in Costa Rica for the profits generated by any party's business transaction to be subject to sharing among the joint adventurers. The agreements only required that for any profit earned by one of the joint adventurers to be subject to the profit-sharing scheme of either agreement, the profit had to arise from a transaction involving subject matter located in Costa Rica.

■  The recitals concerning the previous dealings of the parties are not to be construed as governing or constituting their agreements. As noted in *Northern State Constr. Co. v. Robbins*, 76 Wn.2d 357, 365, 457 P.2d 187 (1969):

> First, the recitals prefaced by "whereas" may be treated as recitals of fact of the state of mind of the parties to the agreement. . . .
>
> . . . [T]he portions of the guaranty in question consist merely of recitals of the states of mind of the parties followed by a recital that consideration was received. These do not constitute a promise or condition which would amount to a contractual element of the agreement. *See Seattle-First Nat'l Bank v. Pearson*, 63 Wn.2d 890, 389 P.2d 665 (1964).

The recitals supply only background for the paragraphs which set forth the bargain that the parties struck on the date of execution of the contracts. The preliminary recitals are available to interpret the meaning of the contracts only when and if their meaning is unclear. In *Brackett v.*

*Schafer,* 41 Wn.2d 828, 834, 252 P.2d 294 (1953), it was stated:

The recital clause on which plaintiff relies does not convey the meaning for which he contends. If it did convey such a meaning, it would be immaterial, for recitals may be resorted to in aid of construction only where there is an ambiguity in the operative portion of the agreement. *First Nat. Bank & Trust Co. v. United States Trust Co.,* 184 Wash. 212, 50 P. (2d) 904; *Franklin v. Northern Life Ins. Co.,* 4 Wn. (2d) 541, 104 P. (2d) 310.

■ The governing contract clauses of both agreements provide for a sharing of profits made by any of the individuals named as parties to the agreements. A joint adventure is a relationship voluntarily assumed and arising out of contract. *Leslie v. Midgate Center, Inc.,* 72 Wn.2d 977, 436 P.2d 201 (1967); *Finn v. Drtina,* 30 Wn.2d 814, 194 P.2d 347, 2 A.L.R.2d 919 (1948); *Paulson v. McMillan,* 8 Wn.2d 295, 111 P.2d 983 (1941); *Carboneau v. Peterson,* 1 Wn.2d 347, 95 P.2d 1043 (1939). The relationship between joint adventurers is a fiduciary one imposing upon each participant the duty of good faith, fairness, candid disclosure and honesty in all matters pertaining to the agreement. *Donaldson v. Greenwood,* 40 Wn.2d 238, 242 P.2d 1038 (1952); *State ex rel. Ratliffe v. Superior Court,* 108 Wash. 443, 449, 184 P. 348 (1919); 46 Am. Jur. 2d *Joint Ventures* § 50 (1969). In the absence of agreement, joint adventurers presumptively share the profits made by the adventure on an equal basis. *Bane v. Dow,* 80 Wash. 631, 142 P. 23 (1914). They may, however, agree upon the percentage of profits which each participant is to receive by contract, and the contract will control.

The record supports the trial court's interpretation of the two agreements. The 1957 agreement contemplated a 50-50 sharing of profits between Rains on the one hand and Walby-Lewis on the other, from "any and all transactions now pending or to arise in the future," including profits made by any one of the parties. The 1958 agreement contemplated a 33⅓-33⅓-33⅓ percent sharing of profits made by

any one of the parties among all three of them from "any and all transactions." In a deposition of Walby filed as a part of the statement of facts, the following question and answer appear:

Q. Weren't you and Lewis taking profit out of this transaction and haven't you actually made profit on the transaction but never accounted to Mr. Rains for it?

A. Well, I say I don't deny that Rains is entitled to one-third of the profit but I say wait until the end of the line and see what the rest of it is.

The record and the agreements substantially uphold the interpretation that each party understood that any profit made by any one of them on a Costa Rican transaction would be shared by the others.

Turning to an examination of the 1958 agreement, we find that it is not supported by any consideration to the plaintiff. The first agreement (1957) provided that Lewis and Walby would enter into an agreement with Rains, and that payments under the Secondary tract agreement (1957) would be in addition to those provided for in the Gutierrez property agreement (1957). The 1958 agreement said that the option on the Secondary tract had been turned over to Lewis and Walby by Rains, and payments on the Secondary tract would be on the same basis as under the Gutierrez Timberlands. The payments that would flow to Rains from a sale or development of the Secondary property under the 1958 agreement grants Rains nothing that he would not receive under the 1957 agreement.

An analysis of each covenant of the 1958 agreement shows that there is no new benefit flowing to Rains from entry into the 1958 contract. Comparison of the benefits to Rains under the two 1957 agreements and the 1958 agreement reveals that under the 1958 agreement:

1. The first covenant lowers Rains' share of the profits;

2. the second covenant grants to Rains and Walby the right to an accounting from Lewis, where the 1957 agreement gave Rains the right to an accounting from Lewis and Walby;

3. the third covenant recites that the Secondary property transaction is a part of the overall agreement of the parties on the same basis as the Gutierrez Timberlands agreement;

4. the fourth covenant is identical to that in the 1957 agreement;

5. the fifth covenant deals with management and gives Rains no new rights; and

6. the sixth covenant contains the statement that the 1958 agreement takes the place of the 1957 agreement.

Under the 1957 supplemental agreement dealing with the Secondary property, Rains was to assign his option to purchase the Secondary property to Lewis, Walby and Tenzler for $2,000 cash. Lewis, Walby and Tenzler were to exercise the option and on completion of the purchase reimburse Rains $6,000. Lewis, Walby and Tenzler contemplated the development of the Secondary property in conjunction with the development of the Gutierrez land. Likewise, Rains and another were to receive $140,000 when the option to purchase the Gutierrez Timberlands was exercised. The 1957 supplemental agreement provided that the payments were to be made to Rains for the assignment of the option to purchase the Gutierrez and Secondary land, to reimburse Rains for funds he had advanced, and to compensate him when the option to acquire these properties was exercised by Lewis, Walby and Tenzler. These payments were to be made regardless of resale or development of the property. The purpose of both of the primary contracts of 1957 and 1958 was to provide for a division of profit on a resale or development of the properties.

█ Walby recognized the absence of consideration to Rains in the 1958 agreement when in his deposition he was asked the reason for changing Rains' interest in the profits from 50 percent to 33⅓ percent, and answered:

A. Because I thought . . . personally I thought that half of the profits was too much.

Q. What consideration was given to Mr. Rains to have him change the agreement from a half to a third?

A. No consideration.

As stated in *Rosellini v. Banchero*, 83 Wn.2d 268, 273, 517 P.2d 955 (1974):

> [A] modification or subsequent agreement is not supported by consideration if one party is to perform some additional obligation while the other party is simply to perform that which he promised in the original contract. . . . [U]nder such circumstances the second agreement must be supported by consideration.

The 1958 agreement gave Rains nothing of benefit to himself other than that to which he was entitled under the 1957 agreement, while requiring him to part with an additional portion of all profits made on any Costa Rican transactions. The 1958 agreement was void for lack of consideration.

Therefore, when the 1958 agreement, which was to supplement and take the place of the 1957 agreement, fails for lack of consideration, the 1957 agreement remains in force and the profit-sharing scheme therein set forth governs. That agreement contemplates that any profits made will be shared with half thereof going to Lewis and Walby, and the other half going to Rains. We conclude that the plaintiff is entitled to recover on that basis.

■ The final contention is that the action for an accounting was premature. It is argued that a joint adventurer does not have the right to an accounting until completion of the adventure since it is not possible to determine whether a profit has been made until then. A joint adventure, however, is in the nature of a partnership, and the rights, duties and liabilities of joint adventurers are generally subject to the rules applicable to partnerships. *Barrington v. Murry*, 35 Wn.2d 744, 215 P.2d 433 (1950); *Paulson v. McMillan, supra; State ex rel. Ratliffe v. Superior Court, supra; Rayonier, Inc. v. Polson*, 400 F.2d 909 (9th Cir. 1968); 46 Am. Jur. 2d *Joint Ventures* § 4 (1969); 60 Am. Jur. 2d *Partnership* § 265-67 (1972).

■ There is a right to an accounting between joint adventurers to determine their respective interests and lia-

bilities. *Wiegardt v. Becken,* 21 Wn.2d 59, 149 P.2d 929 (1944). Following the reasoning that a joint adventurer has similar rights to those of a partner, we look to the law of partnerships to determine a partner's rights to an accounting. Under partnership law, a partner has the right to a formal accounting of partnership affairs, *inter alia,* if the right exists under the terms of an agreement, if another partner secures a profit derived from any transaction connected with the conduct of the partnership or from any use of partnership property, and whenever other circumstances render it just and reasonable. RCW 25.04.210-.220. *See also Donaldson v. Greenwood, supra.* In J. Crane & A. Bromberg, *Law of Partnership* § 72, at 412-13 (1968), we find:

> At common law an action for an accounting was generally denied except incident to dissolution. The feeling was that partners should not seek to have the courts operate their affairs; if they cannot get along together amicably, they should dissolve and wind up. Moreover, no finality could be reached while business activities and financial relations continued. A partner could have his accounting if he dissolved, which he might do as of right if it were a partnership at will, or on subjecting himself to damages for wrongful dissolution if it were not. In either case, he paid the price of destroying the going business. To relieve this dilemma, the framers of U.P.A. deliberately broadened the grounds for accounting, so that they are no longer contingent on dissolution. The feasibility of periodic accounting has long been demonstrated in trust and related proceedings; where necessary, it can be applied to partnerships.
>
> Even without U.P.A., non-dissolution accounting has been decreed when the partnership agreements calls for annual accounts or when a partner has been excluded from participation and profit sharing.

(Footnotes omitted.)

The right to an accounting on request was granted by the express terms of the 1957 agreement, and the right to an interim accounting would have arisen from the alleged failure of the joint adventurer to share profits even if the agreement had not granted the right. *See Dudley v. Lowrie,*

164 Wash. 1, 1 P.2d 854 (1931); *Hogan v. Walsh*, 122 Ga. 283, 50 S.E. 84 (1905).

The judgment is affirmed.

SWANSON and ANDERSEN, JJ., concur.

Petition for rehearing denied October 7, 1975.

Review denied by Supreme Court February 2, 1976.