[No. 3606–1. Division One. July 18, 1977.]

LAKE STEVENS SEWER DISTRICT, *Respondent,* v.
VILLAGE HOMES, INC., ET AL,
*Appellants.*

*Casey, Pruzan, Kovarik & Shulkin* and *Martin Godsil,* for appellants.

*Roberts, Shefelman, Lawrence, Gay & Moch, Lee R. Voorhees, Jr.,* and *William N. Appel,* for respondent.

CALLOW, J.—The defendants Village Homes, Inc., and Washington Federal Savings and Loan Association of Seattle appeal from a summary judgment entered in favor of the plaintiff, Lake Stevens Sewer District, foreclosing liens for sewerage service charges against 67 unoccupied houses owned by the defendant Village Homes, Inc.

The Lake Stevens Sewer District is a municipal corporation established under RCW 56.04. The sewer district owns and operates a public sanitary sewerage disposal system acquired and constructed, in part, from the proceeds of two revenue bond issues of the district of which approximately $1,800,000 par value of bonds remain outstanding. Such bonds, which were issued pursuant to resolution No. 58 in 1968 and resolution No. 94 in 1970, are subject to the following covenants, among others, made by the district with the bondholders:

It will establish, maintain and collect such rates and charges for sanitary sewage disposal service, which . . . will make available for the payment of the principal and interest as the same shall become due on the Bonds and on any Parity Bonds hereafter issued, an amount which shall, after deducting normal operation and maintenance costs, be equal to at least 1.2 times the average annual principal and interest requirements of the Bonds and such Parity Bonds at any time outstanding . . .

and

That it will not furnish sanitary sewage disposal service to any customer whatsoever free of charge, and it

shall, not later than 60 days after the end of each calendar year, take such legal action as may be feasible to enforce collection of all collectible delinquent accounts . . .

Each of the bond resolutions provides that "gross revenue of the District" shall mean all of the earnings and revenue received by the district from any source whatsoever, pledges that such gross revenue of the district shall be paid into a special bond fund, and further provides that the bonds shall be payable solely out of that bond fund and shall not be a general obligation of the district.

The bonds of both issues were issued for the purpose of providing the funds necessary to pay the cost of carrying out parts of the general comprehensive plan for a system of sewers for the district. This comprehensive plan, approved by resolution No. 28 of the district, encompassed the construction and installation of the trunk sewer lines, lift stations, and sewage treatment facilities. Issuance of the district's revenue bonds was authorized at a special election held January 25, 1966, after a finding that the lack of a system of sewers in the district had created an emergency. Resolution No. 28 established the special bond fund of the district from which its revenue bonds are payable and provided that

the District shall set aside and pay into said fund out of the gross revenues of the sewerage system, including all additions thereto and betterments, replacements and extensions thereof at any time made . . . an amount sufficient to pay the principal of and the interest on the bonds as they respectively become due . . .

On April 29, 1968, Village Homes, Inc., entered into a contract with the Lake Stevens Sewer District for installation of a sewer system covering approximately 140 acres of platted land in a large residential tract known as Frontier Village and Frontier Heights. The agreement included the following undertakings:

The district agreed to provide capacity in its trunk sewers and treatment facilities sufficient to treat all sanitary

sewage discharged into the district system from the property owned by Village Homes.

Village Homes agreed in paragraph 2 thereof to construct and install sanitary lateral and trunk sewers on its affected property in accordance with the standards, rules and regulations of the district, and certain other enumerated standards, and to convey such sewer facilities to the district upon completion and acceptance by the district's consulting engineers.

Village Homes agreed to forthwith pay to the district $60,000 as a charge in lieu of assessment against the affected property.

The agreement also contains the following language in paragraph 5:

*The Owner shall be subject to all standards, rules and regulations of the District with respect to* construction of side sewers, connection of side sewers to the sewers of the District (and the sewers constructed pursuant to paragraph 2), the inspection thereof, the permit fee therefor, *the use of the sewers of the District, the rates for the use or availability thereof, and all other matters covered by such standards, rules or regulations;* except that Owner shall not be required to pay a permit fee for the connection of any side or building sewers to the sewers of the District where the inspection of such installation and connection is done pursuant to and is reimbursed under the Contract to pay Engineering Services, dated February 27, 1968, and referred to in paragraph 2(c) of this Contract.

(Italics ours.)

Village Homes, Inc., constructed 250 new houses in their subdivisions in 1968 and 1969, and sold all but 67 of them. Due to a decline in market conditions, the 67 new houses remained vacant for an average of 3 years after completion. Upon completion of construction of the houses which were sold, Village Homes, Inc., notified the sewer district of the sale and the name of the purchaser. The sewer district then commenced billing the purchaser for sewer services. The parties followed this practice for all the houses sold. When

Village Homes, Inc., was unable to sell the last 67 houses, the sewer district began billing it for sewer services. Of the 67 lots, 2 are located in Frontier Heights No. 1, 24 in Frontier Heights No. 2, and 41 in Frontier Heights No. 3. The billings commenced in December 1969 in the cases of lots located in Frontier Heights No. 1 and Frontier Heights No. 2, and early in 1970 for the lots located in Frontier Heights No. 3. The total billed for sewer charges and late payment penalties through September–October 1974 for all 67 lots was $27,657.35, plus interest at 8 percent per annum from the times that the applicable liens were filed. Such liens were filed by the sewer district on 21 separate occasions from April 14, 1970, through November 13, 1974, totaling $27,540.35.

In late 1972 the sewer district commenced this action to recover service charges for the 3–year period of vacancy and for service charges collected by Village Homes, Inc., for the periods thereafter when the houses had either been sold or rented. Summary judgment was granted the sewer district for service charges on the 67 houses from the time the houses were connected to the sewer system until the entry of judgment, which included the 3–year period of vacancy.

The defendants appeal (a) the entry of summary judgment imposing service charges and penalties on unoccupied houses, (b) the dismissal of its counterclaim, (c) the failure to give credit for claimed prior payments of $3,000, and (d) the granting of attorney's fees.

The issues presented are:

1. Was the property owner deprived of due process by the procedure for the collection and foreclosure of sewer charges contemplated by RCW 56.16.100 and .110?

2. Is the occupancy or vacancy of dwellings physically connected to sewer collection and treatment facilities material to the obligation of the property owner to pay sewer service charges authorized by statute to be imposed for the availability of such service?

3. Was the affidavit submitted adequate to establish the fact of physical connection of the subject houses to the public sewers?

4. In the event that the judgment for the sewer district was correct, was the award of attorney's fees under RCW 56.16.110 proper?

> *Does the imposition of a lien for connection and service charges and the foreclosure thereof under RCW 56.16.100 and .110 deprive the property owner of due process?*

■ The owner contends that RCW 56.16.100 and .110 are in violation of the due process clause, article 1, section 3 of the Washington State Constitution, and the fourteenth amendment to the United States Constitution. *North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 42 L. Ed. 2d 751, 95 S. Ct. 719 (1975); *Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972); *Sniadach v. Family Fin. Corp.,* 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969); *Seattle Credit Bureau v. Hibbitt,* 7 Wn. App. 219, 499 P.2d 92 (1972); and *Lucas v. Stapp,* 6 Wn. App. 971, 497 P.2d 250 (1972), are cited by the owner in support of this contention. We disagree.

The statutes provide:

56.16.100 Collection of charges—Lien. The commissioners shall enforce collection of the sewer connection charges and sewerage disposal service charges against property owners receiving the service, such charges being deemed charges against the property served, by addition of penalties of not more than ten percent thereof in case of failure to pay the charges at times fixed by resolution. The commissioners may provide by resolution that where either sewer connection charges or sewer service charges are delinquent for any specified period of time, the district shall certify the delinquencies to the treasurer of the county in which the real property is located, and the charges and any penalties added thereto and interest thereon at the rate of not more than eight percent per year, shall be a lien against the property upon which the

service was received, subject only to the lien for general taxes.

56.16.110 Foreclosure of lien for charges. The district may, at any time after the connection or service charges and penalties are delinquent for a period of sixty days, bring suit in foreclosure by civil action in the superior court of the county in which the real property is situated. The court may allow, in addition to the costs and disbursements provided by statute, such an attorney's fee as it may adjudge reasonable. The action shall be in rem, and may be brought in the name of the district against an individual, or against all of those who are delinquent in one action, and the laws and rules of the court shall control as in other civil actions.

The procedures which make up the statutory scheme for the collection and foreclosure of sewer connection and service charges give the property owner forewarning of the imposition of those charges. The statutes require that suit be brought to convert the claim for charges due to dollars in hand for the sewer district. This provides the property owner with notice and an opportunity to be heard before any deprivation of any interest of the owner occurs and provides a forum for the airing of grievances between the contestants prior to any change of possession of property taking place. The owner is not deprived of the use and possession of property without notice and the opportunity for hearing. This was the violation of due process that the line of cited cases proscribed, and that does not happen under the statutes cited. The defendants were entitled to and did participate in a full judicial determination of the merits concerning the charges imposed. The right to due process was not infringed. *See Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 94 L. Ed. 1088, 70 S. Ct. 870 (1950); *Coffin Bros. & Co. v. Bennett,* 277 U.S. 29, 72 L. Ed. 768, 48 S. Ct. 422 (1928); *cf. McCormacks, Inc. v. Tacoma,* 170 Wash. 103, 15 P.2d 688 (1932).

*Is the occupancy or vacancy of dwellings physically connected to sewer collection and treatment facilities material to the obligation of the property owner to*

*pay sewer service charges authorized by statute to be imposed for the availability of such service?*

The sewer district and the property owner agreed to the following provision in the 1968 contract:

The Owner [Village Homes, Inc.] shall be subject to all standards, rules and regulations of the District with respect to . . . the use of the sewers of the District, the rates for the use or *availability* thereof, and all other matters covered by such standards, rules or regulations.

(Italics ours.) The district was authorized to impose sewerage service charges and enforce utility liens by RCW 56.16. The property owner now maintains that service charges for dwellings physically connected to sewer collection and treatment facilities do not commence when the service is made available, but accrue only when the dwellings are occupied. The owner bases this assertion on a contractual theory that while the district made an offer by connecting the dwellings to the sewage system, there would be no acceptance until the dwellings were occupied and the system actually used.

The statute, RCW 56.16.090, states:

The sewer commissioners of any sewer district, in the event that such sewer revenue bonds are issued, shall provide for revenues by fixing rates and charges for the furnishing of sewerage disposal service to those to whom such service is available.

This statute does not base the imposition of charges upon use, but upon availability. The sense of this approach is persuasive when the practicalities of financing and management are considered. A sewer district can be expected to know when it has made a connection or when service is available to specific property. This is within its sphere of control. On the other hand, it would be unreasonable to require a sewer district to keep track of whether a particular premises was occupied or vacant. In 11 E. McQuillin, *Law of Municipal Corporations* § 31.30a, at 248–49 (3d ed. rev. 1964), we find:

> Sewer charges and fees *are not taxes* or *special assessments* (although occasionally they are so regarded), *but are in the nature of tolls* or rents *paid for services* furnished or *available.* They are sometimes said to be based upon implied contract, but such a theory seems ill suited to that class of cases where there is compulsion to use and to pay for sewer services with no available alternative except a violation of the laws. *Express contracts, however, pertaining to sewer charges frequently are made,* particularly with respect to the use of municipal sewers lying outside the corporate limits, and, if in compliance with applicable laws and in other respects valid, such agreements are enforced according to their terms. But, generally speaking, sewer charges are laid against *property* as *to which* the *sewer is accessible* or useful without regard to contract and *without regard to ownership.*

(Footnotes omitted. Italics ours.)

Faced with a situation in which a property owner, charged for rubbish collection services, claimed there was no duty to pay in the absence of proof that rubbish had been collected, the opinion in *Glendale v. Trondsen,* 48 Cal. 2d 93, 96, 102, 308 P.2d 1, 2, 6 (1957), held that the pertinent rubbish collection ordinance was intended to benefit "'all occupants of places and premises in the City'" and required "that every occupant of buildings must pay the charges for rubbish collection which means that they *must pay whether or not they use* the collection service." (Italics ours.)

The authorities advanced by the property owner involved situations in which the property charged had not been physically connected to the sewer system, or statutes which created collection systems unlike that in our state. The statute before the court in *Hamilton's Appeal,* 340 Pa. 17, 16 A.2d 32 (1940), materially differed from RCW 56.16.090. The Pennsylvania statute provided for the "collection 'of an annual rental or charge *for the use*' of sewer facilities," that charge being "'apportioned equitably among the properties *served.*'" *Hamilton's Appeal, supra* at 20. Further, the Philadelphia ordinance adopted pursuant to the statute

attempted to impose charges upon property solely on the basis of proximity to the system. The opinion stated:

> As the court below stated, by the ordinance of 1940, "the City is requiring payment to be made not only by those who have availed themselves of the right to connect with the sewer but by all those to whom it is made available by its presence." By the terms of the ordinance the charge is made applicable not only to properties actually connected with and accommodated by the sewer system, but as well, inter alia, to (1) vacant lots not connected to the sewer system but abutting thereon, (2) vacant lots connected to the sewer system but not using it, (3) vacant buildings not connected with the sewer system but abutting on it, (4) vacant buildings connected with the sewer system but not actually using it, (5) occupied buildings not connected to the sewer system but abutting thereon, and (6) as construed by the court below, to all properties directly or indirectly discharging surface water into the storm sewer system, regardless of whether they are connected with or are available for connection with the sanitary sewer system.

*Hamilton's Appeal, supra* at 21–22.

Finding that the charges which were to be made were not based upon service rendered but upon the assessed valuation of the lots involved, the court held that the charges proposed were in reality taxes levied in violation of the Pennsylvania State Constitution.

The primary issue raised in *Hamilton's Appeal, supra,* was the constitutionality of the method by which the City of Philadelphia sought to increase its borrowing capacity by securing revenue to pay the indebtedness incurred to construct a sewer system. This is not the issue before this court. In addition, later cases have recognized that a basis for the Philadelphia decision was the absence of any relationship between the charges to be imposed and the value of the service to be rendered. As stated in *Patton–Ferguson Joint Auth. v. Hawbaker,* 14 Pa. Cmwlth. Ct. 402, 407–08, 322 A.2d 783, 786 (1974):

> [W]here a rate schedule based on property assessment had charged rents to vacant lots and buildings which

were not connected to the sewer system, it was held that the rate was not related to the value of the available service and thus was an invalid rate as well as an invalid tax. *Hamilton's Appeal,* 340 Pa. 17, 16 A. 2d 32 (1940).

The opinion was explained also in *Hickory Township v. Brockway,* 201 Pa. Super. 260, 264–65, 192 A.2d 231, 233 (1963), which commented as follows:

> The appellants . . . rely upon *Hamilton's Appeal,* 340 Pa. 17, 21–22, 16 A. 2d 32, 35 (1940). But what that opinion really says is that the charges (1) must be based upon "actual user of the system" and (2) must be "reasonably proportional to the value of the service rendered, not in excess of it". In *Hamilton's Appeal,* supra, the court struck down the proposed rental system primarily because of violation of the first of these two requirements. The so–called rental, it held, was in reality a tax, since it was based upon the assessed valuation of the property, even though the property made no use of the sewer. Thus a rental was charged for vacant lots, for buildings not connected with the sewer system and in other situations where no use whatever was made of the system.

▪ The issue before this court is when does the duty to pay connection and service charges arise, and not whether such charges are invalid as an unconstitutional levy of taxes or improper because they are charges upon property which could not use sewer services. RCW 56.16.090 read prior to 1959 as follows:

> The Sewer Commissioners of any sewer district, in the event that such sewer revenue bonds are issued against the revenues of such system of sewers, shall provide for revenues by fixing rates and charges for the furnishing of sewerage disposal service *to those receiving such service.*

(Italics ours.) The amendment to the statute by Laws of 1959, ch. 103, § 11, dropped the italicized wording and added the present language: "to whom such service is available." We interpret this change as an indication of legislative intent that the charges for furnishing sewer services should be based upon availability. In the area of sewer service charges, we construe "availability" to commence

when a physical connection is made between the side sewer collecting the sewage flow from a particular parcel of property and the main or trunk sewers of the sewer district. This interpretation is consistent with *Giesel v. Broadview Heights,* 14 Ohio Misc. 70, 236 N.E.2d 222 (1968), which held that a sewer charge could not be imposed upon vacant land. It is also compatible with *Jennings v. Walsh,* 214 Kan. 398, 521 P.2d 311 (1974), which struck down an attempt to impose charges against properties still on septic tanks and unconnected with the sewer system. The realities of sewer maintenance and financing require that the availability of sewer services after physical connection has been made be interpreted as tantamount to actual "use." The property is "served" by the system at that time in the statutory sense of the term and the likelihood of health and sanitation exigencies arising in the future has been dispelled. The challenge brought by the property owner against the sewer charges imposed by the district attacks the lack of proof that actual sewage flowed through the side sewers of the charged property to the trunk lines of the system. The occupancy or vacancy of the buildings upon real property subjected to a sewer connection or service charge is immaterial to the obligation of the owner to pay those charges once proof has been presented that the owner has connected to the system.

*Was the affidavit submitted adequate to establish the fact of physical connection of the subject houses to the public sewers?*

The owner contends that proof of the dates the dwellings were physically connected with the public sewer system is based upon a faulty affidavit. It is the owner's position that testimony on the connection dates in an affidavit by the project director for installation of lateral and side sewers to the subject property was hearsay because the director prefaced his testimony with "it is my recollection." We disagree.

■■■ *State v. Elliott,* 68 Wash. 603, 123 P. 1089 (1912), held that the testimony of a witness prefaced by less than a positive degree of assurance, while it may affect the *weight* given to such testimony, is not inadmissible or hearsay. *Isaacs v. National Bank of Commerce,* 50 Wn.2d 548, 551, 313 P.2d 684 (1957). The admissibility of sworn testimony by the witness, preceded by his statement that he had "personal knowledge" of the matter, is not affected by his subsequent testimony based on his "recollection." *See United States v. Brown,* 540 F.2d 1048, 1053 (10th Cir. 1976); *Kline v. Ford Motor Co.,* 523 F.2d 1067, 1069 (9th Cir. 1975); *Flemmi v. Gunter,* 410 F. Supp. 1361, 1368 (D. Mass. 1976); *Schlatter v. Ibarra,* 218 Kan. 67, 542 P.2d 710, 717 (1975); 30 Am. Jur. 2d *Evidence* § 1081 (1967). The owner also contends that the original field notes should have been admitted to prove the connection dates. The owner did not object to this alleged defect to the trial court, and the claimed deficiency may not be raised now. *Crabtree v. Lewis,* 86 Wn.2d 282, 290, 544 P.2d 10 (1975); *Meadows v. Grant's Auto Brokers, Inc.,* 71 Wn.2d 874, 431 P.2d 216 (1967).

We do not find any disputed material facts. The owner contends that (1) the 1968 contract was modified; (2) credit should have been given for the $3,000 defendant paid on account; (3) its counterclaim was improperly dismissed; and (4) that the trial court failed to state with particularity all the documents it relied on in granting the summary judgment.

■■ There is before us no showing of any new consideration for the alleged modification of the contract, and without new consideration there can be no modification. *Rosellini v. Banchero,* 83 Wn.2d 268, 273, 517 P.2d 955 (1974); *Rains v. Walby,* 13 Wn. App. 712, 720, 537 P.2d 833 (1975). The owner did not raise the payment of $3,000 as an affirmative defense pursuant to CR 8(c), or move to amend its answer to assert a setoff. Under such circumstances, the defense has been abandoned. In addition, as the counterclaim did not raise genuine issues of material

fact on any aspect of the case, the trial court could rule on the counterclaim and dismiss it. Finally, the judgment, the oral opinion, and the certification by the trial court of all the "documents and matters" considered in entering the order of summary judgment sufficiently set out the items on which the trial court based its entry of summary judgment. As observed in *American Universal Ins. Co. v. Ranson,* 59 Wn.2d 811, 815–16, 370 P.2d 867 (1962):

> The matters considered may be certified to this court by either of two methods, or a combination of them. First, they may be incorporated in a statement of facts certified by the trial court; second, they may be identified with particularity in the summary judgment signed by the trial court and then furnished to this court by transcript certified by the clerk of court.

*See also Kataisto v. Low,* 73 Wn.2d 341, 438 P.2d 623 (1968). The absence of evidence to rebut the contentions of the district, when considered together with the facts deemed admitted and uncontested or pursuant to the rules of discovery (CR 26–37), supports the granting of summary judgment.

*Was the award of attorney's fees proper?*

■ It is claimed that the award of attorney's fees was improper. RCW 56.16.110 provides:

> The court may allow, in addition to the costs and disbursements provided by statute, such an attorney's fee as it may adjudge reasonable.

As said in *State v. Ralph Williams' North West Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 314, 553 P.2d 423 (1976):

> Appellants also maintain the award was excessive and punitive. The amount of allowable attorney fees and costs is within the discretion of the trial court. We will overturn the court's award only if there exists a manifest abuse of discretion. *St. Paul Fire & Marine Ins. Co. v. Chas. H. Lilly Co.,* 46 Wn.2d 840, 286 P.2d 107 (1955);
> . . .

Here, the attorney's fees of $4,500 allowed plaintiff in the trial court pursuant to RCW 56.16.110 were based upon 130

hours of time billable to plaintiff. The fees awarded were not exorbitant when the time and labor required, and the novelty and difficulty of the questions involved, are considered. *See* (CPR) DR 2–106; (CPR) EC 2–18. The amount of the attorney's fees does not reflect an abuse of discretion by the trial court.

RCW 56.16.110 is to be liberally interpreted to include reasonable attorney's fees on appeal. *See Puget Sound Plywood, Inc. v. Mester,* 86 Wn.2d 135, 144, 542 P.2d 756 (1975). We find the sum of $1,000 to be an appropriate award of additional attorney's fees attributable to this appeal.

Affirmed.

SWANSON and WILLIAMS, JJ., concur.